**SCHENLEY DISTILLERS CORPORATION et al. v. UNITED STATES.**

Civil Action No. 539.

District Court, D. Delaware.

Aug. 14, 1945.

Charles F. Richards, of Wilmington, Del., and Charles E. Cotterill, of New York City, for plaintiffs.

John J. Morris, Jr., U. S. Atty., of Wilmington, Del., and David O. Mathews, Sp. Asst. to Atty. Gen. (Wendell Berge, Asst. Atty. Gen., on the brief), for defendant.

J. Stanley Payne, Asst. Chief Counsel, of Washington, D. C. (Daniel W. Knowlton, Chief Counsel, of Washington, D. C., on the brief, for the Interstate Commerce Commission, intervenor.

Dale C. Dillon, of Mount Ranier, Md. (Tocker, Todd, Donoho & Dillon, of Washington, D. C., on the brief), for Contract Carriers Conference of American Trucking Associations, intervenor.

Jack Garrett Scott and Robert J. McBride, both of Washington, D. C. (H. L. Lewis, of Washington, D. C., on the brief), for Regular Common Carriers Conference of the American Trucking Associations, intervenor.

Before BIGGS and MARIS, Circuit Judges, and LEAHY, District Judge.

MARIS, Circuit Judge.

This petition or complaint filed on March 22, 1945, by Schenley Distillers Corporation and Schenley Distilleries Motor Division, Inc., seeks to enjoin and set aside an order of the Interstate Commerce Commission entered November 25, 1944, denying Motor Division's application for a contract carrier permit, holding that Motor Division may not continue to operate in interstate commerce without a permit and directing that it immediately discontinue such operations. The plaintiffs seek a judgment directing the Commission to dismiss the application of Motor Division for a permit upon the ground that no permit is required to conduct the transportation business of Motor Division.

The case was heard by the court, constituted of three judges pursuant to the Urgent Deficiencies Act of October 22, 1913, 28 U.S.C.A. § 47, on May 4, 1945. The Interstate Commerce Commission, the Regular Common Carrier Conference and the Contract Carrier Conference of the American Trucking Associations, Inc., intervened as defendants. A certified copy of the evidence submitted to the Commission was received in evidence by the court. All parties stipulated that the hearing should be deemed the final hearing. From the admitted allegations of the petition or complaint and the evidence the court makes the following special

### Findings of Fact

1. Plaintiff Schenley Distillers Corporation is a corporation organized and existing under the laws of the State of Delaware, with principal executive office in New York, N. Y. It was organized in 1933 as a holding company. On September 30, 1938, it also became an operating company engaging in the manufacture, sale and distribution of alcohol and alcoholic beverages.

2. Plaintiff Schenley Distilleries Motor Division, Inc., hereinafter called Motor Division or applicant, is a corporation organized and existing under the laws of the State of Delaware, having its principal executive office in New York, N.Y., and its principal operating office in Lawrenceburg, Ind.

3. On September 28, 1943, Motor Division filed an application with the Interstate Commerce Commission, under section 209 of the Interstate Commerce Act, 49 U.S.C.A. § 309, for a permit authorizing operation, in interstate and foreign commerce, as a contract carrier by motor vehicle, of alcoholic liquors and various other commodities between the following points, on the one hand: Jersey City, N. J., Philadelphia and Schenley, Pa., Cedarhurst, Md., Terre Haute and Lawrenceburg, Ind., Covington, Frankfort, Lexington, Louisville, Stamping Ground, Lebanon, Limestone Springs, and Carrollton, Ky., and, on the other hand, all points in 19 States and the District of Columbia.

4. The application was referred to an examiner of the Commission and a hearing thereon was held at Brooklyn, N.Y., December 8, 1943. Various associations of motor and rail carriers and individual motor carriers appeared at the hearing as protestants against the granting of the application. Thereafter, briefs were filed, an examiner's recommended report, together with a recommended order, issued

and served, and exceptions thereto and replies to the exceptions were filed.

5. On November 25, 1944, the Commission, Division 5, issued a report, Schenley Distilleries Motor Division, Inc., Contract Carrier Application, 44 M.C.C. 171, and an order which denied the application. Applicant submitted a petition for reconsideration by the full Commission, which was denied February 12, 1945.

6. In the report of Division 5, which was made part of the order, it was stated that the truck operations of Motor Division should immediately be discontinued.

7. Although in form the application sought a permit authorizing operating as a contract carrier, its primary purpose was to secure a determination whether applicant's operations are those of a contract carrier or of a private carrier. At the outset of the hearing, applicant requested dismissal of the application·on the ground that applicant's operations are those of a private carrier, as defined in section 203(a) (17) of the Interstate Commerce Act, 49 U.S.C.A. § 303(a) (17), and therefore not subject to the permit requirements of section 209, 49 U.S.C.A. § 309. The evidence submitted by applicant related solely to the question of its status.

8. For the reasons given in the report the Commission found that applicant's operations were not those of a private carrier nor those of a common carrier but that "in performing the described services applicant is engaged in operation as a contract carrier by motor vehicle for hire subject to the permit requirements of the Act."

9. The Commission further found that "Applicant disclaims any desire or intention of operating other than as a private carrier, and there is no evidence tending to show that the operations here sought would be consistent with the public interest and the national transportation policy," and that "Consequently the application must be denied," but "If applicant elects to attempt to justify operation as a contract carrier, it should petition for further hearing in this matter for the purpose of introducing further proof."

10. No petition for further hearing has been filed with the Commission. As the Commission found the described operations to be those of a contract carrier, and that applicant is performing said operations without a permit, in violation of section 209 of the Act, it directed in the report that "the described operations should immediately be discontinued."

11. The ultimate findings of the Commission were: That operation by applicant in the transportation of property of the described corporations is that of a contract carrier by motor vehicle as defined in section 203(a) (15); that applicant has failed to show that the proposed operations will be consistent with the public interest and the national transportation policy, and that the application should be denied.

12. Schenley Distillers Corporation, hereinafter called the parent corporation, owns all of the capital stock of Motor Division, except directors' qualifying shares. It also owns all but the qualifying shares of numerous other corporations engaged in operating distilleries, industrial alcohol plants and wineries and in the importation and exportation of wines and liquors, including:

Associated Kentucky Distillers Company, a Kentucky corporation, which operates a distillery and warehouse at Lebanon, Ky.

Bernheim Distilling Company, a Kentucky corporation, which operates two distilleries at Louisville, Ky.

Green River Distilling Company, a Maryland corporation, which operates a distillery at Stamping Ground, Ky.

New England Distilling Company, a Kentucky corporation, operating a distillery at Covington, Ky.

Joseph Finch & Company, a Pennsylvania corporation, operating a distillery and warehouse at Schenley, Pa.

Old Quaker Company, a Maryland corporation, which owns a distillery and bonded warehouse at Lawrenceburg, Ind. The operations of this distillery are now carried on by Schenley Distillers, Inc., a Maryland corporation.

James E. Pepper & Company, a Kentucky corporation, operating a distillery at Lexington, Ky.

George T. Stagg Company, a corporation, operating distilleries at Frankfort, Carrollton, and Limestone Springs, Ky.

Monticello Distillery Company, a corporation, operating a distillery and an industrial alcohol plant at Cedarhurst, Md.

Cresta Blanca Wine Company, a Delaware corporation, operating a winery at Livermore, Calif.

Roma Wine Company, a Delaware corporation, operating plants at Lodi, Healdsburg, and Kingsburg, Calif.

13. The parent corporation also owns all of the stock or a controlling interest in a number of other corporations, including the Three Feathers Distilling Company. It also owns in part the shares of the Dubonnet Corporation, a Pennsylvania corporation, with a plant at Philadelphia, Pa., and another at Lodi, Calif., and engaged principally in the bottling of Dubonnet aperitif wine and vermouth.

14. The parent corporation and its manufacturing and sales subsidiaries distribute and sell their products throughout the United States. Their net sales for the fiscal year ended August 31, 1943, were approximately $180,000,000.

15. The management of the parent corporation selects all of the officers and directors of its subsidiaries: and in most instances the directors of the subsidiaries are either directors or officers of the parent corporation. All policies affecting the operation of these subsidiaries are formulated or approved by the officers of the parent corporation, thereby giving it complete and direct control over the operations of the subsidiaries. The parent corporation makes available daily to each subsidiary sufficient funds to meet its cost of operation, which funds are handled as accounts payable to the parent corporation on the books of the subsidiary, and as accounts receivable on the books of the parent corporation. The finished products of these subsidiaries are bought by the parent corporation at a sum somewhat above the actual cost, thereby affording the subsidiary a margin of profit determined by the parent corporation.

16. In the conduct of their businesses the parent corporation and its subsidiaries cause to be transported inbound to their plants large quantities of grain, malt, barrels, bottles, and shipping cases. They ship outbound large quantities of alcoholic beverages and certain by-products. These products and by-products are shipped to wholesalers and to various states, including ·Ohio, Pennsylvania, Virginia, and 13 or 14 others, called "monopoly buyers," which reserve to themselves the exclusive right to sell alcoholic beverages within their domains and purchase all alcoholic beverages at wholesale. There is also a movement of whiskeys and other products from one subsidiary distillery to another.

17. The Schenley group of corporations depends principally upon rail carriers for their transportation, although the services of both motor common and contract carriers are utilized to a considerable extent ·for outbound shipments and to a lesser extent on inbound shipments of raw materials and supplies. The aggregate transportation charges paid by them to public carriers aggregate $3,000,000 annually, of which 85%, or $2,550,000, is paid to railroads, and 15%, or $450,000, to common or contract carriers by motor vehicle. In addition, they pay to Motor Division, for transportation of their materials and finished products, an aggregate amount of approximately $142,000 annually.

18. In the fall of 1941 the parent corporation ordered 75 motor vehicles of the tractor-trailer type, 50 of which were delivered at a cost of over $250,000. They were first registered under State motor vehicle laws in the name or names of the subsidiaries using them, principally in Indiana in the name of the Old Quaker Company. On February 19, 1942, Motor Division was formed and title to these vehicles was transferred to it. The vehicles are now registered in its name, some in Indiana, some in Pennsylvania, some in Kentucky, and five in California. The decision to create Motor Division was made after study of the motor transportation situation, which took into account, among other factors, the advantages to be gained by the creation of a separate transportation organization and the centralization of the management of the trucks and the supervision of their operation. ·

19. In organizing Motor Division, 1,000 shares of stock were authorized and issued representing a paid-in capital of $50,000. Motor Division's president is also vice president and a director of the parent corporation, as well as president and director of a number of other Schenley subsidiaries. As in the case of other subsidiaries, the parent corporation bears all the expense of operation.

20. The principal operating office of Motor Division is at Lawrenceburg, Ind., the location of the distillery of the Old Quaker Company. For purposes of compliance with the laws of Delaware, under

which it was incorporated, Motor Division maintains an office at 100 West 10th St., Wilmington, Del.

21. Motor Division now transports and in the future, so far as it can predict, will transport, only commodities the title to which at the time of transportation is in the Schenley Distillers Corporation or one or another of its subsidiary corporations.

22. The operation of Motor Division's vehicles is under the direction of a general manager, whose headquarters are at Cincinnati, Ohio. Said general manager also is transportation engineer of the parent corporation but he holds no position with any of the other subsidiaries. When merchandise is to be moved the matter is taken up with Motor Division's general manager who determines how and when the movement should be made, the number of vehicles required, whether Motor Division's trucks are available for the transportation, and whether, if he decides to use a Motor Division vehicle, the vehicle may be leased to a common or contract carrier by motor vehicle to avoid the necessity of Motor Division returning the truck empty to its starting point. He determines whether the merchandise is to be shipped by rail, by motor common carrier, by motor contract carrier (other than Motor Division), or by Motor Division. After making his decision he issues the necessary instructions to the plants involved.

23. The whole area specified in the application to the Commission for a permit is actually or potentially the area of the use of Motor Division's vehicles, that is to say, transportation has been or may be performed by Motor Division throughout the whole area described in the application, embracing 19 states and the District of Columbia.

24. Motor Division began operations in interstate commerce shortly after it was incorporated on February 19, 1942. At no time has it had a certificate, permit, or other operating authority issued under the provisions of the Interstate Commerce Act.

25. The Commission found that although contracts and agreements were entered into between Motor Division and the various other Schenley subsidiary corporations which purported to lease the Motor Division's vehicles to said subsidiaries, such contracts and agreements were not in fact leases and that Motor Division retained control of the physical operation of the vehicles, and that it was in each instance of transportation the actual carrier. In this connection the Commission found that Motor Division, "in effect, disclaims the status of equipment lessor." The record shows that Motor Division claimed that the system of leases and subleases was merely an "internal accounting arrangement," but this characterization is inaccurate, as the purported leases and subleases in fact provide for and fix the compensation which the various subsidiary corporations pay to Motor Division for transportation services performed by it.

26. Although in the form of a "rental" charge, the Commission found that the payment, by the respective subsidiaries to Motor Division, of $50 per week per truck plus 10 cents per truck per mile, was in fact compensation paid to Motor Division for transportation performed for them by Motor Division. The Commission found that Motor Division's primary, and in fact only, business is the transportation of property for compensation.

27. Motor Division's income for transportation services performed by it for the various Schenley subsidiaries (spoken of as its "rental" income) was approximately $71,000 for the six-month period ended August 31, 1943. Its actual operating expense for that period was approximately $75,000.

28. The contracts between Motor Division and said subsidiary corporations obligate Motor Division to procure all required licenses, provide public-liability and property-damage insurance, maintain the vehicles in good mechanical condition, supply lubricating oil, gasoline, and tires, and display on the equipment the name of Motor Division as owner and the name of the subsidiary as lessee. Motor Division provides a driver for each unit; and the right to hire and discharge the drivers rests entirely with Motor Division.

29. On shipments transported by Motor Division the sale price is based f.o.b. destination, rather than f.o.b. the plant as is the practice where shipments are transported by public carriers. The difference between the f.o.b. price at the plant and that at destination is generally equivalent to the charges maintained by common carriers.

30. The transportation performed by Motor Division is of three types: First, transportation inbound to the distilleries

of the various subsidiary corporations of bottling supplies, such as empty glass bottles, shipping containers, corks, labels, glue, repair and maintenance items, stationery, etc. Second, transportation of alcoholic liquors in barrels, bottles or cases on outbound distributions to wholesale liquor dealers and to the States known as monopoly buyers. Third, inter-company transportation of whiskeys and various other commodities between the plants of the various subsidiaries.

31. Several of the subsidiary distilling companies have been engaged exclusively and others have been engaged partly in producing alcohol under orders of the War Production Board for the Defense Supplies Corporation. This alcohol has been shipped by railroad in tank cars or by motor vehicle in tank trucks and none of it has been transported by Motor Division.

32. Although it was testified that the motor vehicles now owned by Motor Division were acquired in 1941 in anticipation of a shortage of public transportation facilities in the event of war, there is no showing that such a shortage developed nor is there anything to indicate an intention on the part of Motor Division or its parent corporation to dispose of said vehicles or to cease operations as a motor carrier in interstate commerce upon the termination of the war.

### Discussion

As stated in our findings of fact, Schenley Distilleries Motor Division, Inc., which we have called Motor Division, is a wholly-owned subsidiary of Schenley Distillers Corporation, which we have called the parent corporation. On September 28, 1943, Motor Division filed an application with the Interstate Commerce Commission. The applicant's ostensible purpose was to procure a permit authorizing it to operate as a contract carrier and to transport in interstate commerce by motor vehicle the property of the parent corporation and of many of its subsidiaries. However, since Motor Division at the same time requested that the application be dismissed on the ground that it was not a contract carrier it is clear that the applicant's real objective was to secure a determination that Motor Division was a private carrier not subject to the permit provisions of the Interstate Commerce Act.

Division 5 of the Commission, to which the application was referred, did not pass upon the motion to dismiss. It found that Motor Division was not a common carrier but that it was a contract carrier requiring a permit to enable it to operate legally in interstate commerce. Upon the merits it found that Motor Division had failed to show that the proposed operations would be consistent with the public interest and the national transportation policy. It denied the application.[1] Motor Division sought reconsideration by the full Commission but this was denied and the order of Division 5 was adopted as the Commission's order.

Motor Division thereupon brought the present suit against the United States in this court and was joined as party plaintiff by the parent corporation. The latter had not been a party to the application nor an intervenor in the proceedings before the Commission. The plaintiffs seek to have the order of the Commission annulled and enjoined and to procure an order directing the Commission to dismiss the application on the ground that the trucking operations of Motor Division would not be carriage for compensation and consequently would not require a permit.

■ It is urged by the defendant that the order is not reviewable in a proceeding such as this instituted under the Urgent Deficiencies Act and that this court is without jurisdiction. In a prior proceeding this court had occasion to consider the identical issue and concluded that it had jurisdiction. Schenley Distillers Corporation v. United States, D.C.1943, 50 F.Supp. 491. We adhere to the views there expressed and for the reasons there fully stated conclude that this court has jurisdiction of the present suit. Compare Cornell Steamboat Company v. United States, 1944, 321 U.S. 634, 64 S.Ct. 768, 88 L.Ed. 978, in which the reviewability of the Commission's order was assumed by the Supreme Court.

■ It is also contended by the defendant that the parent corporation has no legal interest sufficient to entitle it to maintain this suit. The fact that the parent corporation was not a party to the application for the permit nor an intervenor in the proceedings before the Commission would not bar it from bringing suit to

[1] Schenley Distilleries Motor Division, Inc., Carrier Application, November 25, 1944, 44 M.C.C. 171.

set aside the resulting order of the Commission if the order subjects it to such legal injury, actual or threatened, as would give it standing to sue. Edward Hines Yellow Pine Trustees v. United States, 1923, 263 U.S. 143, 147, 44 S.Ct. 72, 68 L.Ed. 216. Here, however, the parent corporation predicates its right to sue solely upon its ownership of Motor Division's capital stock and control and management of its affairs. In Pittsburgh & W.Va. Ry. v. United States, 1930, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980, the mere financial interest of a minority stockholder of a carrier corporation was held not to be sufficient to show a threat of the sort of legal injury necessary to entitle the stockholder to bring a suit to set aside a Commission order against the carrier corporation. The fact that the parent corporation here owns all the stock of Motor Division does not change the character of its interest. The injury feared is still the indirect harm which may result to any stockholder from harm to his corporation. The alleged interest arising from the parent corporation's management and control of Motor Division is equally insufficient to give it standing to sue. The parent corporation is in this respect in no different position from any corporate board of directors or chief executive officer. We hold that the complaint must be dismissed as to the parent corporation.

We come then to the question which Motor Division raises upon the merits, which is whether the Commission erred in finding that Motor Division is a contract carrier and in refusing to find that it is a private carrier as defined in Section 203(a) of the Interstate Commerce Act.[2]

Section 203(a) provides that as used in Part II of the Act, relating to motor vehicles

"(14) The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, except transportation by motor vehicle by an express company to the extent that such transportation has heretofore been subject to part I, to which extent such transportation shall continue to be considered to be and shall be regulated as transportation subject to part I.

"(15) The term 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) and the exception therein) by motor vehicle of passengers or property in interstate or foreign commerce for compensation.

    \*    \*    \*    \*    \*

"(17) The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

It will be observed that under these definitions a carrier which is a common carrier or a contract carrier cannot be a private carrier, since the definition of a private carrier in subparagraph (17) specifically excludes both common and contract carriers. Since it was found by the Commission and conceded by the parties that Motor Division is not a common carrier the issue is narrowed to whether Motor Division comes within the definition of a contract carrier in subparagraph (15) or of a private carrier in subparagraph (17).

The Commission found that Motor Division engaged in the transportation by motor vehicle of property in interstate commerce for compensation. Thus all the elements entering into the definition of a contract carrier were found to exist in the operations of Motor Division. The contention is made that as to at least one of these fact findings the Commission was in error. The plaintiffs urge that Motor Division does not conduct its business "for compensation"; that implicit in "compensation" is a profit motive and that this is completely absent in the case of Motor Division. We do not agree that "compensation" as used in the statutory definition, necessarily involves an element of profit. On the contrary it may under some

---

[2] 49 U.S.C.A. § 303(a).

circumstances involve merely reimbursement for expenses of operation.

■ The plaintiffs next point to the fact that Motor Division is wholly owned and completely controlled by the parent corporation and argue that when Motor Division transports the property of its affiliates the operations are not carriage for compensation in any sense but are only incidental to the single commercial enterprise of the group of corporate entities comprising the Schenley liquor business. They argue that though Motor Division is a legal entity separate and distinct from that of the parent corporation and its subsidiaries, nevertheless for the purposes of this controversy the Commission and the court should look behind the form and determine that Motor Division is but a unit in the common enterprise.

This argument finds no support either in law or in equity. As the Supreme Court said in Gray v. Powell, 1941, 314 U.S. 402, 414, 62 S.Ct. 326, 334, 86 L.Ed. 301: "The choice of disregarding a deliberately chosen arrangement for conducting business affairs does not lie with the creator of the plan." See to the same effect Moline Properties v. Commissioner, 1943, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499. True it is that courts have many times disregarded the corporate form when it was used to justify wrong, protect fraud, defend crime or evade statutory inhibitions. In Munson S. S. Line v. Commissioner, 2 Cir., 1935, 77 F.2d 849 for example, the court found that the legislative purpose of developing the merchant marine would be best served by disregarding the corporate entity. No one of these reasons is present here. Indeed, insofar as the legislative intent is disclosed in the Interstate Commerce Act it would seem best served by subjecting to the control of the Commission transporters which function as does Motor Division.

The refusal of the Commission to disregard the corporate status of Motor Division is consistent with prior decisions in similar cases involving transportation by one subsidiary corporation for manufacturing or producing subsidiaries of the same parent company. See Enterprise Trucking Corp. Application, 1941, 27 M.C.C. 264; Lee Wilson & Co. Application, 1941, 29 M. C.C. 525; Lukens Steel Company Application, 1943, 42 M.C.C. 672.

We have been favored by the parties and intervenors with an exhaustive analysis of the opinions of the Commission upon applications such as L. A. Woitishek Common Carrier Application, 42 M.C.C. 193, and Williams Brothers Corporation Contract Carrier Application, May 16, 1945, —— M.C.C. ——, and of cases such as Interstate Commerce Commission v. Clayton, 10 Cir., 1942, 127 F.2d 967, and A. W. Stickle Co. v. Interstate Commerce Commission, 10 Cir., 1942, 128 F.2d 155. In each of these as well as many others cited in which it was necessary to determine whether the carriage was for hire or was private carriage it was found helpful to determine whether the primary business was the supplying of transportation or whether the transportation was merely incidental. The problem there requiring solution does not concern us since in this case it is undisputed that the primary and indeed sole business of Motor Division is that of transportation.

■ The Commission found that Motor Division receives from each subsidiary fifty dollars a week as a rental charge and ten cents for each mile operated for each vehicle used by the subsidiary. It also receives payments from the common carriers and contract carriers to which it may lease vehicles from time to time. Thus for the six months period ending August 31, 1943 Motor Division had an income from its transportation business of some $71,000. We think these facts, which are uncontradicted, prove conclusively that Motor Division transported "for compensation." We conclude that the Commission did not err in finding that Motor Division is a contract carrier.

■ A contract carrier may not operate without a permit from the Commission. Since Motor Division has produced no evidence to show that its operations are consistent with the public interest and the national transportation policy, as required by Section 209 of the Act, it follows that the Commission properly denied Motor Division a permit to operate as a contract carrier. Accordingly, we reach the following

### Conclusions of Law

1. Schenley Distillers Corporation has no legal interest sufficient to maintain this action.

2. The order of the Commission, entered November 25, 1944, although negative in form, is affirmative in its immediate consequences and is reviewable by this court.

3. Schenley Distilleries Motor Division, Inc., is not a common carrier, as it does not hold itself out to serve the general public.

4. It engages in the transportation by motor vehicle of property in interstate or foreign commerce, under individual contracts or agreements, for compensation, and is therefore a contract carrier within the meaning of section 203(a) (15) of the Interstate Commerce Act.

5. It does not own the property which it transports and it has no legal interest in such property either as lessee, bailee, or otherwise, except the temporary possession of the property as a carrier. The property which it transports is not for the purpose of sale, lease, rent, or bailment by it and is not transported in furtherance of any commercial enterprise, other than transportation, by it. It is not a private carrier within the meaning of section 203(a) (17) of the Interstate Commerce Act.

6. Under the facts in this case it cannot be held, without disregarding the corporate entities of Motor Division and of the corporations for which it transports, that Motor Division's operations are incidental to and in furtherance of a commercial enterprise other than that of transportation for hire. In declining to ignore the legal entities which the parent corporation has found it desirable to set up, the Commission did not err as a matter of law. The law does not require that the Commission disregard corporate entities for the purpose of exempting from regulation under the Interstate Commerce Act transportation which would otherwise be subject to that Act.

7. In finding that Motor Division is not a private carrier within the meaning of section 203(a) (17) of the Interstate Commerce Act but is a contract carrier as defined in section 203(a) (15) of that Act, the Commission did not err.

8. The Commission's findings of fact and its conclusions of law are fully supported by the evidence.

9. The Commission's order is not invalid for any of the reasons advanced by plaintiffs.

10. The relief sought by plaintiffs must be denied and their petition or complaint dismissed.

A judgment will be entered dismissing the petition or complaint.