## EMPIRE BOX CORP. OF STROUDSBURG et al. v. WILLARD SULZBERGER MOTOR CO., Inc., et al.

**Civ. No. 195–49.**

United States District Court D. New Jersey.

May 6, 1952.

Milton, McNulty & Augelli, by John Milton, Jr., Jersey City, N. J., for plaintiffs.

Samuel Rosenblatt, Montclair, N. J., for defendant.

Edward V. Ryan, Asst. U. S. Atty., Jersey City, N. J., Asa J. Merill, New York City, Atty. for Interstate Commerce Commission, for intervenor.

SMITH, District Judge.

This is an action under the Declaratory Judgment Act, 28 U.S.C.A. § 2201. The jurisdiction of the Court is based upon Sections 1331 and 1332 of Title 28 U.S.C., 28 U.S.C.A. §§ 1331 and 1332. The plaintiffs seek a declaratory judgment that a contract, heretofore made by the Empire Box Corporation and the defendant, is illegal. The Interstate Commerce Commission, having been granted leave to inter-

vene in this action, filed a complaint seeking similar relief and in addition thereto "such other and further relief as may be just and proper."

## Facts

### I.

The Empire Box Corporation of Stroudsburg, a Delaware corporation, hereinafter identified as Empire of Stroudsburg, is engaged in the manufacture and production of paper board and maintains a plant in Stroudsburg, Pennsylvania. The Empire Box Corporation, a Delaware corporation, hereinafter identified as Empire of Garfield, is engaged in the manufacture and production of paper board boxes and maintains a plant in Garfield, New Jersey. The paper board manufactured by the former is used by the latter in the manufacture of its products.

### II.

The Willard Sulzberger Motor Co., a corporation of New Jersey, hereinafter identified as Sulzberger Motors, is a motor carrier and maintains an office in Passaic, New Jersey. This corporation does not own any motor trucks, but leases from others such equipment as may be necessary in its operations.

### III.

The Sulzberger Motors and the Empire of Garfield entered into a contract by the terms of which the former ostensibly leased to the latter five tractors and ten trailers for use primarily in the transportation of paper board and waste paper over routes between Stroudsburg and Garfield, and New York City and Stroudsburg. This contract was assigned by Empire of Garfield to Empire of Stroudsburg, and thereafter, in May of 1947, the operations thereunder were commenced. The pertinent clauses of the contract are recited in the appendix hereto annexed.

### IV.

The pertinent terms and conditions embodied in the contract may be briefly summarized as follows:

Sulzberger Motors agreed to (a) furnish five tractors and ten trailers and maintain this equipment in good repair; (b) procure drivers, subject however to "selection" by Empire of Stroudsburg; (c) supply gasoline, oil, parts, etc.; (d) supervise the operation of the tractors and trailers; (e) procure the necessary licenses and pay the fees therefor; (f) maintain "such cargo insurance and fire, theft and collision insurance upon the tractors and trailers as Empire (of Stroudsburg) may deem necessary."

Empire of Stroudsburg agreed to: (a) pay a "rental," determined on the basis of $2.50 per ton of paper board or waste paper carried, less deductions for wages, workmen's compensation insurance, and social security taxes, provided the transportation was within the radius prescribed by the contract, to wit, 100 miles from the point of origin; (b) pay "a sum equal to the present carload rail rates" for the transportation of paper board and waste paper to and from points beyond the said radius; (c) pay a minimum "rental" of $5,600 for a twenty-eight day period, determined on the basis of $2.50 per ton for a minimum of 2,240 tons. The base rate was subject to adjustment under the formula prescribed by the seventeenth clause, in which the increase or decrease of labor cost is made the determinative factor.

It was further agreed that "possession" of the vehicles was to be vested in Empire of Stroudsburg, and that the control and operation thereof was to be under its direction. This seemingly broad grant of possession and control was limited, as indicated by specific provisions of the contract. The right of Empire of Stroudsburg to use the vehicles was restricted to the use of the trailers "in and around" the plants in Garfield and Stroudsburg and the use of the tractors "in and around" the plant at Garfield; the use of the tractors in the operations at the Stroudsburg plant was prohibited. (Fourth Clause). The liability of Empire of Stroudsburg for damage to the vehicles was limited to damage occasioned in their permitted use; it assumed no liability for any other damage, including damage occasioned by the negligence of its employees. (Sixth Clause). The grant of possession and control was obviously ostensible and so intended by the parties.

## V.

■ The course of conduct subsequently pursued by the parties is clearly consistent with their obvious intent to establish an interstate carrier service under the mere guise of a lease. Sulzberger Motors furnished to Empire of Stroudsburg a transportation service usually furnished by a contract carrier.

Sulzberger Motors (a) rendered a transportation service for which it was compensated on the basis of actual tonnage carried over routes within prescribed territorial limits, a basis commonly adopted by a contract carrier; (b) supervised the operations, either directly or indirectly, except the operations "in and around" the plant of Empire of Stroudsburg; (c) hired a dispatcher who supervised the operations as its employee, although carried on the payroll of Empire of Stroudsburg; (d) leased the vehicles from their owners, who hired the drivers; (e) assumed responsibility for the maintenance of the vehicles and supplied gasoline, oil, tires, etc.; (f) assumed responsibility for the safe delivery of cargo; (g) maintained the necessary insurance as required by contract, including public liability insurance; (h) indirectly assumed liability for the wages due and payable to the dispatcher and drivers; (i) indirectly assumed liability for the costs of employment compensation insurance and social security taxes incurred by reason of the employment of the dispatcher and drivers; (j) permitted the deduction of the said wages and costs, which were paid directly by Empire of Stroudsburg, from the total charges due and payable under the contract; (k) imposed upon its lessors the responsibility for the procurement of necessary licenses for the vehicles, a responsibility directly assumed by it under the contract.

Empire of Stroudsburg (a) assumed nothing more than its liability for the transportation charges due and payable under the contract; (b) permitted the Sulzberger Motors to select and hire the dispatcher and drivers notwithstanding the right of "selection" reserved to it by the contract; (c) carried the dispatcher and drivers on its pay-roll, and paid the costs of employment compensation insurance and social security taxes, but deducted these wages and costs from the total charges due and payable to Sulzberger Motors under the contract; (d) exercised no control or supervision over the operations, except that usually exercised by a shipper.

## VI.

These operations were consistent with the provisions of the contract, except the provisions of the Fifth Clause, and were obviously contemplated by the parties at the time the contract was made. The specious nature of the Fifth Clause, under which possession of the vehicles and control of the operations were purportedly vested in Empire of Stroudsburg, is clearly evidenced not only by the related clauses but also by the conduct of the parties. Sulzberger Motors retained possession of the vehicles and control of the operations; the possession and control actually vested in Empire of Stroudsburg was limited by the Fourth Clause, which permitted the exclusive use of the vehicles only "in and around" the plants at Garfield and Stroudsburg.

## VII.

Sulzberger Motors was engaged in the transportation of property in interstate commerce for compensation, and was therefore a "contract carrier by motor vehicle" within the meaning of Section 203 (a) (15) of Part II of the Interstate Commerce Act as amended, 49 U.S.C.A. § 303 (a) (15). The rental agreement was nothing more than a subterfuge designed to disguise the true nature of the operations and thus evade regulation under the Act. Sulzberger Motors was therefore subject to regulation under the Act notwithstanding the rental agreement.

## VIII.

■ The described operations violated Section 209(1) of Part II of the Interstate Commerce Act as amended, 49 U.S.C.A. § 309(1) because there was not "in force with respect to" Sulzberger Motors "a permit issued by the" Interstate Commerce Commission. Since these operations were contemplated by the parties to the contract and were recognized as part of the consideration, the contract was illegal.

## IX.

The District Supervisor of the Bureau of Motor Carriers, Interstate Commerce Commission, after investigation, advised the parties by a letter dated March 1, 1949, that the operations under the contract violated the Interstate Commerce Act. Thereafter the attorneys of the Empire of Stroudsburg, by letter of March 4, 1949, requested Sulzberger Motors "to agree to a termination of the agreement." The attorney for the latter responded, by letter of March 5, 1949, that his client was "unwilling to terminate the agreement until there is a determination by a court of competent jurisdiction that one or more of the provisions * * * are in violation of I.C.C. regulations, and that such provisions cannot be properly amended, modified or deleted." The present action was commenced on March 17, 1949.

## X.

The parties agreed to suspend further operations under the contract pending the determination of the questions presented in this litigation. The suspension became effective on June 20, 1949.

## Discussion

The defendant challenges the jurisdiction of the Court on two grounds: first, the lack of the necessary jurisdictional amount, to wit, $3,000, exclusive of interest and costs; and second, the absence of a justiciable controversy. The arguments in support of the contention are without merit.

 The jurisdiction of the Court is based upon Sections 1331 and 1332 of Title 28, U.S.C., supra, which require that "the matter in controversy" exceed "the sum or value of $3,000, exclusive of interest and costs". The value of the contractual rights is here determinative of the value of the "matter in controversy". Davis v. American Foundry Equipment Co., 7 Cir., 94 F.2d 441, 115 A.L.R. 1486, and the cases therein cited. The evidence before the Court clearly indicates that the value of these rights exceeds the minimum prescribed by statute.

 There is an "actual controversy" within the meaning of the Declaratory Judgment Act, supra. Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240, 241, 57 S.Ct. 461, 81 L.Ed. 617; Keener Oil & Gas Co. v. Consolidated Gas Utilities Corp., 10 Cir., 190 F.2d 985, 989; Motor Terminals v. National Car Co., 3 Cir., 182 F.2d 732, 734; South Side Theatres v. United West Coast Theatres Corp., 9 Cir., 178 F.2d 648, 650, 651. When Sulzberger Motors, having been advised by a representative of the Interstate Commerce Commission that its operations were illegal, refused to consent "to a termination of the agreement," a justiciable controversy arose. There were available to Empire of Stroudsburg but three courses: first, continuance of operations under the contract which would have exposed it to the risk of prosecution under Section 222(c) of Part II of the Interstate Commerce Act, 49 U.S.C.A. § 322(c); second, termination of the contract over the objection of Sulzberger Motors, which would have exposed it to the risk of a suit for damages; or third, commencement of an action under the Declaratory Judgment Act, supra. The possible consequences of either of the first two courses were avoidable only by adoption of the last. The case is therefore one "admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding". Ætna Life Ins. Co. v. Haworth, supra [300 U.S. 227, 57 S.Ct. 464].

The determination of the meritorious issues presents little difficulty. The actual nature of the operations is necessarily determinative of the status of an ostensible lessor and the applicability of Part II of the Interstate Commerce Act. Georgia Truck System v. Interstate Commerce Commission, 5 Cir., 123 F.2d 210, and other cases hereinafter cited. Section 203(a)(15) of the said Act contains the following apposite definition: "The term 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) of this section and the exception therein) by motor vehicle of * * *

property in interstate * * * commerce for compensation." The conclusion that Sulzberger Motors was a "contract carrier by motor vehicle", as defined by the statute, admits of no doubt.

The undisputed evidence before the Court, and the inferences of which it is reasonably susceptible, clearly support our conclusion that Sulzberger Motors was engaged as a contract carrier in the transportation of property in interstate commerce for compensation. United States v. La Tuff Transfer Service, D.C., 95 F.Supp. 375; Interstate Commerce Commission v. Isner, D.C., 92 F.Supp. 582; Interstate Commerce Commission v. F. & F. Truck Leasing Co., D.C., 78 F.Supp. 13; Motor Haulage Co. v. United States, D.C., 70 F.Supp. 17; Schenley Distillers Corporation v. United States, D.C., 61 F.Supp. 981. Its operations without a permit violated Section 209(1) of the Act, supra. Ibid.

The observations made by the United States Court of Appeals, Fifth Circuit, in the case of Georgia Truck System v. Interstate Commerce Commission, supra, are equally pertinent here. It is therein stated, 123 F.2d at pages 211 and 212: "We think it may not be doubted that if the evidence supports (defendant's) view that its business was confined to simply renting trucks for use by others, (defendant) would be right in its insistence that it was not engaged in transportation within the invoked act. We are equally without doubt however, that the evidence in this case affirmatively establishes that (defendant's) business is not so confined. On the contrary, though its operations have been to some extent invested with the form of a renting or hiring business, this investiture is but a device or subterfuge behind and under which (defendant), in substance and in reality, operates a transportation business. It is true that the contracts, under cover of which the operations were conducted, are in most of their provisions carefully drawn to give color to (defendant's) claim of renting only, and if the operations had been conducted strictly within that form, there might have been some question whether the operations so conducted were transportation operations within the invoked act.

When, however, the contracts are read in the light of the construction accorded them by the parties by the actual operations under them, it is clear that the scheme as a whole is a mere subterfuge, an unpermitted evasion, not a real avoidance of the provisions of the law."

The evidence likewise supports our conclusion that the operations were contemplated by the parties to the contract. The grant of possession and control of the vehicles embodied in the Fifth Clause would appear to be absolute, but when this clause is considered and construed in the light of the other clauses it seems reasonably clear that no such grant was intended. Any doubt as to the nature of this grant is dispelled when the contract as a whole is considered in the light of the construction obviously accorded it by the parties; the operations were actually conducted in the manner consistent with the provisions of the contract and the intent of the parties. The contract was, therefore, illegal.

## Right of Intervenor

The Interstate Commerce Commission, as intervenor, may have the relief to which it is entitled under the law and evidence. Federal Rules of Civil Procedure, Rule 54(c), 28 U.S.C.A. The evidence in this case is sufficient to entitle the Commission to injunctive relief under the express provisions of Section 222(b) of the Act, 49 U.S.C.A. § 322(b). It is our opinion that such relief, consistent with the cited provision, should be granted in the public interest.

## Conclusions

### I.

The Court has jurisdiction of the controversy and of the parties thereto.

### II.

The operations under the contract were in violation of Part II of the Interstate Commerce Act for the reasons hereinabove stated.

### III.

The contract was illegal for the reasons hereinabove stated.

The plaintiff and intervenor are directed to prepare and submit to the Court, on notice to the defendant, a proper order for judgment.

### Appendix

"First: Sulzberger hereby leases to Empire, and Empire hearby hires from Sulzberger, five (5) tractors and ten (10) trailers, which said tractors and trailers shall be in perfect operating and mechanical condition and shall be painted and lettered as instructed by Empire. The cost of the initial lettering and painting of said tractors and trailers shall be divided equally between Empire and Sulzberger; the cost of all lettering after the initial lettering shall be borne by Empire and the cost of all painting after the initial painting shall be borne by Sulzberger. Sulzberger also agrees that at any time, upon twenty-four hours' prior notice by Empire, to lease to Empire such additional tractors and trailers owned or controlled by Sulzberger as may be required by Empire, and for such time or times as they may be so required. Whenever Empire has the need for the additional tractors and trailers, it agrees to give Sulzberger the first option to supply such additional equipment. If Sulzberger is unable to supply such additional equipment, then Empire may hire or engage such equipment from sources other than Sulzberger or may cause its materials or products to be shipped by common carrier or by other means of transportation.

"Second: Sulzberger agrees to procure for Empire, subject to Empire's selection, duly licensed chauffeurs who shall be duly qualified and capable of operating said tractors and trailers. Said chauffeurs so procured by Sulzberger for Empire shall be employees of Empire subject to its sole discretion and control, and said chauffeurs shall operate said tractors and trailers to and from such points as Empire shall direct. Said chauffeurs may be discharged at any time by Empire, and upon such discharge, Sulzberger agrees to procure new chauffeurs satisfactory to Empire; it being understood that the selection, hiring and discharge of chauffeurs shall at all times be in the sole discretion and control of Empire.

"Third: Empire shall pay to Sulzberger, for the use of such tractors and trailers, the sum of Two Dollars and Fifty Cents ($2.50) per ton on all paperboard and wastepaper, subject to the deductions hereinafter provided for, transported by Sulzberger within a radius of one hundred miles from the point of origin, which point of origin shall be not more than the distance from Garfield, New Jersey, to White Plains, New York. In the case of transportation of paperboard and wastepaper for a distance in excess of one hundred miles from the point of origin, Empire agrees to pay to Sulzberger a sum equal to the present carload rail rates for such transportation from the point of origin to the point of destination. Although not limited to the same, the general routes of transportation will include trips between Garfield, New Jersey, and Stroudsburg, Pennsylvania. The parties understand that the tractors and trailers may be required to be sent only partially loaded or, in some cases, without any load whatsoever, from any point to another to pick up deliveries of wastepaper, paperboard or other articles, and that payments shall be made to Sulzberger only for the tonnage actually carried or transported on any of said trips; for example, tractors and trailers may be sent empty to New York City to pick up paper for delivery to Stroudsburg. On such a trip, the payment due to Sulzberger will be based solely upon the tonnage carried from New York City to Stroudsburg, i. e., the place of origin to the final or ultimate destination. Upon delivery of said waste paper or other materials to Stroudsburg, the tractors and trailers are to be loaded with paperboard or other material at Stroudsburg for delivery to Garfield; then payment will be similarly made for that tonnage, i. e., from the place of origin to the final and ultimate destination. If the total tonnage actually transported by Sulzberger for Empire during any twenty-eight day period is less than two thousand two hundred forty tons, then Empire shall within five days after the end of such twenty-eight day period, pay to Sulzberger a sum equal to Two Dollars and Fifty Cents ($2.-50) per ton for each ton representing the

difference between the actual tonnage actually transported during the said twenty-eight day period and said two thousand two hundred forty tons, unless the failure to transport such minimum tonnage of two thousand two hundred forty tons per twenty-eight day period was occasioned by the failure of Sulzberger to make tractors and trailers available in sufficient quantities to transport such minimum tonnage. All of the following items and expenses shall be deducted by Empire from the aforesaid sums to be paid by Empire to Sulzberger:

"(1) All wages paid by Empire to the Chauffeurs who shall operate the tractors and trailers.

"(2) All social security taxes, both state and federal, and the cost of workmen's compensation insurance which are payable by reason of wages or salaries paid to such chauffeurs.

"Fourth: The parties agree that Empire shall have the right to use said trailers for hauling purposes in and around the plant of its subsidiary corporations in Stroudsburg, Pennsylvania, and in and around its plant in Garfield, New Jersey, at such times as the trailers are not otherwise in use as provided for herein, without the payment of any charge therefor. When the said trailers are being used in or about Empire's plant at Garfield, New Jersey, Empire shall also have the right to use the said tractors in moving the said trailers; the said trailers may also be used by Empire in and about the plant of its said subsidiary corporation at Stroudsburg, Pennsylvania, but the tractors shall not be used in connection with the moving of trailers in or about said plant at Stroudsburg, Pennsylvania. If, while the said tractors or trailers are used by Empire, as provided for in this paragraph, the said trailers or tractors are damaged in any way, Empire agrees, anything to the contrary contained herein notwithstanding, to cause said trailers or tractors, as the case may be, to be repaired at its own cost and expense.

"Fifth: The parties agree that upon Empire's taking possession of the aforesaid tractors and trailers under this lease, the possession or control of said vehicles shall be entirely vested in Empire as against all of the world, including Sulzberger, and that the operation thereof will be solely and exclusively under the direction and control of Empire.

"Sixth: The parties agree that Empire shall not be responsible for any damage which the tractors and trailers leased hereunder may sustain, whether or not the same may be due to the negligence of Empire or its employees, except as provided for tractors and trailers in paragraph 'Fourth' hereof, and that upon the termination of this agreement, Empire shall surrender to Sulzberger possession of said tractors and trailers in their then state and condition without any liability whatsoever on the part of Empire for any damage or depreciation thereto.

"Seventh: Sulzberger agrees to keep said tractors and trailers in perfect operating condition at its own expense, throughout the term of this lease, and to maintain and inspect them and to replace all worn out equipment, including worn out tractors and trailers in their entirety. Sulzberger shall supervise the operation of said tractors and trailers and shall have them available in perfect operating condition at whatever time and place directed by Empire. Sulzberger shall keep and supply said tractors and trailers with all gasoline, oil, grease, anti-freeze compound and such parts as may be necessary to operate said tractors and trailers. Empire agrees that the gasoline and fuel tanks located on Empire's property may be used for the storage of the gasoline and fuel to be used in connection with the operation of said tractors and trailers, but Empire shall not be responsible for the contents of said tanks, and invoices covering purchases of gasoline and fuel shall be billed by the supplier direct to Sulzberger.

"Eighth: In the event that Sulzberger fails to furnish the tractors or trailers herein provided for or any of them at such time or place designated by Empire, except for the causes enumerated in paragraph 'Fourteenth', or in the event that any such tractors or trailers become in disrepair and are unable to commence or complete its delivery, and if any of such events shall oc-

cur between the hours of 8 A.M. and 8 P.M., Sulzberger shall have three (3) hours after oral notice thereof to him or to any of his employees to substitute or furnish such tractors or trailers in place of the ones in disrepair, and if any of such events shall happen between the hours of 8 P.M. and 8 A.M., Sulzberger shall have six (6) hours after oral notice to him or to any of his employees to furnish said tractors or trailers and to substitute or furnish other tractors or trailers in place of the ones in disrepair. Should Sulzberger fail so to furnish said tractors or trailers within the time provided for herein, Empire shall have the right to cause the load which was to be shipped by such tractors or trailers not so furnished or in disrepair, or to cause the load which was in the course of shipment upon the tractors or trailers becoming in disrepair, to be transported by any common carrier or contractor, or private carrier, and such part of the cost thereof which exceeds the sum which would have been payable to Sulzberger by virtue of the completion of such a trip shall be deducted from the sum due hereunder to Sulzberger.

"Ninth: The rent payable hereunder by Empire to Sulzberger, based upon the tonnage transported, as herein provided, less the deductions as herein provided, shall, for the first week of operation under this agreement, be payable on Saturday of the next following week, and payments thereafter shall continue to be made on Saturday of each week for the rental due for the preceding week. By this procedure Empire shall have seven days to compute the said rental due to Sulzberger before payment thereof shall be due and payable.

"Tenth: Sulzberger is given the right to establish a maximum weight for each load, such maximum, however, to be not less than thirteen tons, and Empire agrees not to load any more paper or paper products on said trailers at Stroudsburg above the established maximums. Sulzberger, however, shall have the full and sole responsibility in the event that any of the said trailers are at any time overloaded. Sulzberger agrees to pay all fines and penalties imposed by any governmental authority, court or justice of the peace, for any reason whatsoever, including fines for overloading. Sulzberger also agrees to procure and keep in force, at his own expense, all tractor and trailer licenses which may be necessary for the continued operation of said tractors and trailers. Empire agrees that so far as possible, when materials therefor shall be available, to load each trailer to full visible capacity on each trip.

"Eleventh: Empire agrees to provide to Sulzberger a bill of lading with each load and to maintain accurate records of the amount of freight transported by the tractors and trailers so furnished by Sulzberger and to make available to Sulzberger duplicates thereof.

"Thirteenth: Sulzberger agrees to maintain in force and effect, at its own cost and expense, such cargo insurance and fire, theft and collision insurance upon the tractors and trailers as Empire may deem necessary.

"Seventeenth: It is mutually agreed that the rate of Two Dollars and Fifty Cents ($2.50) per ton shall be tied in with labor costs involved herein. At the date hereof, the chauffeurs are not unionized. Sulzberger calculates the present cost of labor for each trip contemplated by this agreement to be as follows:

"$10. for one 'over the road' man;

"$5. for a local man;

"$2. for a dispatch man;

making a total of Seventeen Dollars ($17) per round trip. If said chauffeurs are unionized after this contract has become effective, resulting in increased labor costs, the rate per ton shall be increased from Two Dollars and Fifty Cents ($2.50) in accordance with the formula hereinafter mentioned in this paragraph. Regardless of the unionization of the chauffeurs, at the end of the second full year of this contract, the parties agree to re-examine the rate per ton in the light of the then existing labor costs. If at that time the labor costs shall exceed present labor costs, the rate per ton to be paid by Empire shall be increased in proportion to the increased labor costs as the same relates to the average round trip revenue. For example, if the average round trip shall consist of twenty tons of

paper products at $2.50 per ton, thus producing a round trip revenue of $50, and the present labor cost per round trip is $17, the present percentage of labor cost is 34%. In the event that the labor cost per round trip, by reason of unionization during the first two years, or thereafter for any reason, shall be increased to $20 per round trip, the percentage of labor cost per round trip revenue will then be 40%, or an increase of 6%. In such event the rate of $2.50 per ton shall be increased 6%, or $.15 per ton, to a new rate of $2.65 per ton. In the event that labor costs at the end of the two year period shall be less than at the inception of the contract, a decrease in the rate per ton shall be calculated on the same basis. In the event that by reason of increased tonnage there is a reduction in the labor cost of Sulzberger, that is to say, in the salaries of dispatcher or a reduction of the use of a 'local man', the full savings thereof are to be credited to Empire. After the adjustment, if any, at the second anniversary of this contract, the parties agree to adjust the rate in accordance with the above formula on each anniversary date for the full five year term of this contract.

"Twentieth: The obligations and duties of Sulzberger hereunder, including those of keeping and maintaining the tractors and trailers herein leased by Empire from Sulzberger in good operating condition and repair, are personal to Sulzberger and this contract may not be assigned by Sulzberger."