The CITY OF NEW YORK, Plaintiff,

v.

Richard Joyce SMITH and William J. Kirk, as Trustees of the New York, New Haven and Hartford Railroad Company, and not individually, Defendants.

No. 67 Civ. 1954.

United States District Court
S. D. New York.

Jan. 15, 1968.

 

J. Lee Rankin, Corporation Counsel, by Samuel Mandell, New York City, for plaintiff.

William P. Jones, New York City, for defendants.

---

MANSFIELD, District Judge:

Plaintiff moves to remand this declaratory judgment action to the New York State Supreme Court, where it was originally brought, on the ground that the amount in controversy does not exceed $10,000, 28 U.S.C. § 1332(a) (1),[1] and therefore the action is not removable to the federal courts. 28 U.S.C. § 1441(a).[2] The action arises as the result of a dispute as to the meaning and effect of a contract between the City of New York and the defendants, the Trustees (Connecticut and Massachusetts citizens) of the New York, New Haven and Hartford Railroad ("Railroad" herein).

In November 1965, the City of New York ("City" herein) and the Trustees entered into a contract that provided for railroad freight service into a terminal market under construction by the City at Hunt's Point in the Bronx. Under the agreement, certain tracks called "Lead Tracks" and "Market Tracks", were, to be constructed at the City's expense. In turn, Paragraph Second of the contract provided:

"(a) Except as provided in subparagraph (b), the Railroad shall, subject to applicable tariffs (including, but without limitation, those governing the handling of ferry or trap cars) move over the Lead Track and switch onto and from the Market Tracks located in the Market, cars of carload freight and less-than-carload or any-quantity freight received from connecting railroads or originating on the line of the Railroad, consigned to lessees in or users of the Market, and shall deliver to connecting railroads or to consignees on the line of the Railroad, similar shipments originating in the Market, and place on and remove from the Market Tracks empty cars at the request of the City, consignees, or shippers in the Market, all at such times as shall be mutually convenient and consistent with good railroad operating practices.

"(b) Lessees in the Market, to be entitled to the aforesaid sidetrack service on any of the Market Tracks, shall first have executed with the Railroad a Sidetrack Service Agreement in a form heretofore submitted to the City, as identified by the parties. Delivery of freight to such a consignee shall be deemed complete when the car containing such freight is placed on the Market Track designated in the aforesaid Sidetrack Service Agreement.

"(c) Consignees receiving shipments on any of the public delivery tracks will not be required to execute such Sidetrack Service Agreement. Delivery of cars containing freight consigned to users of public delivery tracks will be handled in accordance with rules and regulations as contained in duly published tariffs."

█ Under Interstate Commerce Commission Rules and Regulations, the

---

1. "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—
    "(1) citizens of different States".

2. "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

risk of loss on a public delivery track does not pass from the railroad to the consignee until the consignee opens the car to remove the freight, which may take place several days after the car is placed on the tracks. Where private tracks are used, however, the railroad may require the consignee to accept the risk of loss as soon as the car is placed on the private track, and before it is opened.

The individual Sidetrack Service Agreement submitted by the Railroad to the City contained the following provision:

> "WHEREAS, the Industry desires that the Railroad switch cars containing freight consigned to or shipped by the Industry to and from the Market Tracks adjacent to the aforesaid Space, or, if the Industry requests for its convenience, to and from some other accessible Market Track, such other accessible Market Track to be determined by the Railroad upon notice to the Industry depending upon availability and operating conditions at the time, such adjacent Market Tracks and such other accessible Market Track as so utilized by the Industry constituting for the purpose of this Agreement the 'Sidetrack'; ".

In addition, Paragraph One of the agreement stated that

> "The placing on said Sidetrack of any car containing freight consigned to the Industry to be deemed to be a full delivery of such freight to the Industry."

The City's tenants at first refused to sign the individual Sidetrack Agreements, claiming that the quoted provisions were contrary to and inconsistent with the terms and conditions of the basic agreement, and in their ire caused a boycott of all freight deliveries by the Railroad into the market. Some tenants eventually signed the Agreement under protest, after having received assurances that the City would institute the present action. The Railroad contends that since the City has excluded the public from receiving rail service in the market, so that only the tenants have been receiving service, it is entitled to treat the market tracks as private sidetracks. However, the question whether the "Market Tracks" are public delivery tracks, with risk of loss passing when the tenant opens the car, or are private sidetracks, with risk of loss passing to the tenant when the car is placed on the track, need not be decided upon the present motion which raises the question of whether the amount in controversy exceeds $10,000.

■ The Railroad claims that if the City should ultimately prevail, the increased risk of loss from vandalism, pilferage, and fire would cost it well in excess of $10,000, including annual patrolmen's expenses of $33,000. Plaintiff argues that since it is not seeking a pecuniary judgment, the jurisdictional amount is lacking. This contention must be rejected, however, for the reason that the test is the value of the contract or property rights in dispute rather than the amount of damages sought. M. Swift & Sons, Inc. v. Lemon, 24 F.R.D. 43 (S. D.N.Y.1959); Davis v. American Foundry Equip. Co., 94 F.2d 441, 443, 115 A.L. R. 1486 (7th Cir. 1938); Empire Box Corp., etc. v. Willard Sulzberger Motor Co., 104 F.Supp. 762 (D.N.J.1952); 1 Moore, Federal Practice ¶0.95 (2d ed. 1964).

■ A more interesting contention is that since the benefits of the interpretation sought by the plaintiff would not flow to it but to the tenants, examination of the amount in controversy from plaintiff's viewpoint, Dri Mark Prods., Inc. v. Meyercord Co., 194 F.Supp. 536 (S.D.N.Y.1961); 1 Moore, Federal Practice ¶0.95[1] (2d ed. 1964); but see Ronzio v. Denver & R. G. W. R. R., 116 F. 2d 604 (10th Cir. 1940); Note, 73 Harv. L.Rev. 1369, 1372–73 (1960), does not reveal the requisite amount. The action, however, concerns a third-party bene-

ficiary contract, in which the promisee seeks a determination of the rights of the beneficiaries. Under New York law, a promisee may maintain an action on behalf of its beneficiaries, Johnson Serv. Co. v. E. H. Monin, Inc., 253 N.Y. 417, 171 N.E. 692, 77 A.L.R. 214 (1930) (Cardozo, C. J.); Croker v. New York Trust Co., 245 N.Y. 17, 156 N.E. 81 (1927); Rothenberg v. Wolfman, 16 Misc.2d 124, 183 N.Y.S.2d 139 (Sup.Ct.1958) (dictum), and under Rule 17(a), F.R.Civ.P., he is expressly deemed a real party in interest. Since state law gives the City the right to its bargained for benefits, Rule 17(a)'s policy points to the conclusion that the jurisdictional amount should be determined by the value that would result to the beneficiary-tenants, who need not be named as parties, under the interpretation sought by the City. Furthermore, if the rationale of the $10,000 requirement is to "conserve federal judicial resources for 'important' cases", see Note, 73 Harv.L.Rev. 1369, 1372 (1960), this case would appear to belong in the federal courts just as much as if the City were suing solely on its own behalf. See Wilbur v. Ford, 81 F.Supp. 641 (D.Mass.1949) (by implication).

■ The Railroad estimates that if the "Market Tracks" are ultimately to be treated as public delivery tracks, the risk of loss due to thefts, pilferage, etc. would require it to employ four patrolmen and one supervisor at an annual cost of $33,-000, whereas if it were determined that the "Market Tracks" were in reality private sidetracks, the potential loss that the Railroad would endeavor to reduce by this step would fall upon the tenant. Since the City does not contest either the propriety of hiring patrolmen for this purpose, or the cost thereof, the figure of $33,000 per year appears to be the minimum estimate of the amount in controversy from the City's viewpoint.

Since the amount in controversy exceeds $10,000, the City's motion must be denied.

So ordered.