Manny BERGER, on Behalf of Himself and All Others Similarly Situated, Plaintiff-Appellee,

v.

Margaret HECKLER, Secretary of the Department of Health and Human Services of the United States, Defendant-Appellant.

No. 924, Docket 84–6360.

United States Court of Appeals, Second Circuit.

Argued March 15, 1985.

Decided Aug. 26, 1985.

John M. Rogers, Dept. of Justice, Appellate Staff, Civ. Div., Washington, D.C., Richard K. Willard, Acting Asst. Atty. Gen., Robert S. Greenspan, Dept. of Justice, Appellate Staff, Civ. Div., Washington, D.C., Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., for defendant-appellant.

Arthur J. Fried, Legal Aid Soc., Administrative Law Unit, New York City, for plaintiff-appellee.

Before KAUFMAN and CARDAMONE, Circuit Judges, and TENNEY, Senior District Judge.[*]

TENNEY, Senior District Judge:

Appellant Margaret Heckler, the Secretary ("Secretary") of Health and Human Services ("HHS"),[1] challenges several orders implementing a final judgment entered by consent ("consent decree" or "decree") regarding the eligibility of certain aliens for Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 1382c(a)(1)(B)(ii) (1982) ("Section (B)(ii)"), which was enacted in 1972 as part of Title XVI of the Social Security Act ("Act"). In pertinent part, that provision ("the 'color of law' provision") confers SSI eligibility on aliens who are "permanently residing in the United States under color of law." *Id.*

At issue are orders of the United States District Court for the Eastern District of New York, Charles P. Sifton, *Judge*, which (1) granted in part plaintiffs' motion seeking to have the Secretary held in contempt and to have the decree otherwise enforced, (2) denied the Secretary's motion pursuant to Fed.R.Civ.P. ("Rule") 60(b)(5), in which she requested relief from the terms of the decree, (3) provided for an amendment ("Amendment") of the decree, and (4) denied the Secretary's motion pursuant to Rule 59(e), in which she challenged the Amendment.[2]

In substance, the Secretary argues on this appeal that the Amendment is improper because it exceeds the scope of the underlying statute, and does not comport with the intent of the parties. The Secretary also argues that the district court exceeded its authority in ordering her to promulgate regulations to implement the consent decree. In addition, the Secretary contends that the court lacked jurisdiction to enforce the decree because the case is moot with respect to the two beneficiaries named in the decree, and, finally, that the court lacked jurisdiction to enforce the decree with respect to nonparties. The appellees—plaintiff Manny Berger ("Berger") and persons who intervened to enforce the decree—maintain that the district court's actions were proper, and that the orders should be affirmed in their entirety.

We agree with the appellees that the Secretary's arguments do not warrant reversal of the lower court's orders. Indeed, we find that the court's actions were, almost without exception, entirely justified in the face of the appellant's demonstrated noncompliance with the terms of the underlying decree. In connection, however, with

---

[*] Of the Southern District of New York, sitting by designation.

1. HHS was formerly, and at the time this action was instituted, called the Department of Health, Education and Welfare. The term HHS will be used herein to refer to the agency at all times pertinent to this opinion.

2. It has already been determined, on a motion by plaintiffs to limit the matters before the court on this appeal, that all four of the orders listed in the text are properly raised at this time.

the Secretary's challenge to the district court's requirement that she promulgate regulations, we find that the Amendment should be modified to exclude the requirement that language specified by the court be contained in the regulations promulgated. As so modified, the Amendment, and the other orders of the district court are affirmed.

## BACKGROUND

Berger instituted this action in 1976 to challenge the termination of his SSI benefits. He had come to the United States from Russia in 1948, on a temporary visa. He overstayed his visa, and in 1967 he voluntarily surrendered to the Immigration and Naturalization Service ("INS"). Although Berger was subsequently ordered deported, the travel documents required for his deportation to the Soviet Union could not be obtained by the agency. In 1975, therefore, the INS placed Berger under an "order of supervision" pursuant to section 242(d) of the Immigration and Naturalization Act ("INAct"). 8 U.S.C. § 1252(d) (1982). In addition, HHS terminated Berger's SSI benefits. HHS asserted that, because of his alienage status, Berger did not meet the eligibility requirements for the SSI program as set out in section 1382c(a)(1)(B).

The SSI program is designed "to assure a minimum level of income for people who are age 65 or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level." 20 C.F.R. § 416.110 (1984). The section of the Act at issue provides that in order to receive SSI benefits an individual must be either

(i) a citizen or (ii) an alien lawfully admitted for permanent residence *or otherwise permanently residing in the United States under color of law* (including any alien who is lawfully present in the Unit-

ed States as a result of the application of the provisions of section 1153(a)(7) or section 1182(d)(5) of Title 8).

42 U.S.C. § 1382c(a)(1)(B)(i), (ii) (emphasis added).

Plaintiff's amended complaint, filed in 1977, was in the nature of a class action. It raised claims on behalf of Berger and the class composed of those aliens permanently residing in the United States under color of law who have been denied SSI benefits solely because the Secretary has determined that they are not in this country under color of law.[3]

The complaint asserted, *inter alia*, (1) that Section (B)(ii) "requires that SSI benefits be granted to all otherwise eligible aliens permanently residing in the United States under color of law, and not just to those who are in this country as a result of the application of 8 U.S.C. §§ 1153(a)(7) or 1182(d)(5)," and (2) that the Secretary had erred in denying SSI benefits to Berger and the plaintiff class.

Later in 1977, Emma Mena ("Mena"), who is now deceased, moved to intervene in this action. Mena was diagnosed in 1963 as having cancer. She first received SSI benefits in 1975. In 1976, she was informed that her SSI benefits would be discontinued because her alienage status prevented her from meeting the eligibility requirements for the program. She then notified the agency that an immediate relative immigrant visa petition had been filed on her behalf, and pointed out that INS Operations Instruction[4] ("INSOI") 242.1(a)(24) prohibited her deportation during the pendency of the petition. When her benefits were not reinstated, she moved to intervene in the instant case.

In June 1978, the parties and the court signed a five-page consent decree stipulating to the following matters. First, plaintiff Berger, "an alien residing in the United States under an order of supervision issued pursuant to 8 U.S.C. § 1252(d), is an alien

---

**3.** Excluded from the class were those aliens who were legal permanent residents or residents pursuant to section 1153(a)(7) or section 1182(d)(5) of Title 8.

**4.** Operations Instructions are the internal departmental regulations of the INS.

permanently residing in the United States under color of law pursuant to [Section (B)(ii)]." Second, proposed intervenor Mena, "an alien who is the beneficiary of an immediate relative immigrant visa petition and thus has been afforded indefinite voluntary departure by the [INS] pursuant to [INSOI] 242.10(a)(b)(i), is an alien permanently residing in the United States under color of law pursuant to [Section (B)(ii)] since at least December 1, 1976," the month in which Mena's SSI benefits ceased. Further, ¶ 3 of the consent decree set forth the agreement of the parties regarding the interpretation accorded the "color of law" language of Section (B)(ii). Paragraph 3 provided in full that

Aliens who are permanently residing in the United States under color of law and who may be eligible for [SSI] benefits include, but are not limited to: (1) aliens admitted to the United States pursuant to 8 U.S.C. § 1153(a)(7); (2) aliens paroled into the United States pursuant to 8 U.S.C. § 1182(d)(5); and (3) aliens residing in the United States pursuant to an order of supervision, indefinite stay of deportation or indefinite voluntary departure. *Any other alien residing in the United States with the knowledge and permission of the [INS] and whose departure from the United States the [INS] does not contemplate enforcing is also permanently residing in the United States under color of law and may be eligible for [SSI] benefits.*

(Emphasis added). Finally, ¶ 5 of the consent decree provided that the Secretary would "take all steps necessary to ensure that this order is carried out by the employees of the Social Security Administration...." No appeal was taken from this decree.

Set forth below is a discussion of the motions made below and the district court's disposition of those motions.

### A. *Motion for Contempt*

In July 1982, Berger and several intervenors ("plaintiffs") moved for an order adjudging the Secretary in contempt for failure to comply with the decree. At issue on that motion was what action the Secretary was required to take under ¶ 5 of the decree to ensure that the decree would be carried out by the agency's employees.

1. *Disposition of the Plaintiff's Arguments.* Plaintiffs asserted that the Secretary should be ordered to revise the agency's regulations and internal operating instructions to reflect the terms of ¶ 3, which, as discussed above, interpreted the scope of the "color of law" language of Section (B)(ii). The court found that the Secretary had not adequately publicized the terms of ¶ 3 of the consent decree, and ordered that the Secretary "take steps to effectuate the terms of the final judgment by promulgating amendments to the Secretary's regulations and operations manuals and agency guidelines stating the Secretary's position [as set forth in ¶ 3]."

Plaintiffs also sought an order directing the Secretary to specify in the applicable regulations the twenty-two categories of aliens which plaintiff alleged were clearly residing in the United States with the knowledge and permission of the INS and whose departure from the United States the INS did not contemplate enforcing. Instead, the court directed the parties to settle an amended final judgment setting forth fifteen categories of aliens whose members the parties agreed were to be considered permanently residing in the United States under color of law. Although the court rejected the plaintiffs' request for an order directing the Secretary to list twenty-two categories of aliens in the regulations, the court stated that "[i]t would best serve the interests of clarity and concreteness and evidence the Secretary's good faith compliance with the judgment if those categories of aliens about which the parties are in agreement were listed in the final judgment and published to agency personnel and applicants." [5]

---

**5.** In rejecting plaintiff's request, the court stated that the terms of the decree would be satisfied if the governing regulations contained "an open-ended category which would generally embrace

**2. *Disposition of the Secretary's Arguments.*** In opposition to the motion, the Secretary first argued that the scope of ¶ 3 should be limited—based on her reading of *Holley v. Lavine,* 553 F.2d 845 (2d Cir. 1977), *cert. denied sub nom. Shang v. Holley,* 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978)—so that only those aliens who have received a letter from the Department of Justice stating that the INS does not contemplate enforcing his or her departure from the United States would be deemed to be permanently residing in the United States under color of law. The district court rejected this argument on the ground that the plain meaning of ¶ 3 precluded the Secretary's proposed reading.

The Secretary also argued that the policy set forth in the decree—that aliens are to be considered permanently residing in the United States under color of law if they are ·here with the knowledge and permission of the INS and the INS does not contemplate enforcing their departure—had already been made clear in existing regulations. The court rejected this argument, concluding that existing regulations and internal operating instructions suggested that the "under color of law" provision had a much narrower scope than that set forth in ¶ 3.

Finally, the court noted that the Secretary had advised the court that it was her position that the language of ¶ 3 might cover some categories of aliens who did not qualify under the statute as permanent residents under color of law. The court stated that the Secretary should pursue this argument by moving for relief from the judgment, rather than by refusing to carry out its terms.

### B. *Rule 60(b) Motion*

The Secretary subsequently moved under Rule 60(b)(5) for relief from the decree on the theory that certain portions of it were *ultra vires* and that, therefore, it would be

all ... cases [in which the INS manifested an intent not to deport an alien]." The court stated further that the judgment would be satisfied in this respect by the promulgation of regulations

inequitable for those portions to have prospective application.

The Secretary argued that the legislative history of Section (B)(ii) indicated that the only aliens Congress intended to make eligible for SSI pursuant to the "color of law" language were political refugees and aliens who entered the country prior to July 1948. The Secretary also contended that certain language in ¶ 3 of the decree was confusing and inaccurate under current immigration law and procedure. In a written opin‐ion, the court rejected both of the Secretary's contentions.

### C. *Amendment*

After the court's ruling on the Rule 60(b) motion, the plaintiffs submitted a proposed final judgment. The Secretary filed papers in opposition to this proposed modification, and—without relinquishing her right to challenge the substance of the court's construction of the decree—presented her own proposed amended final judgment. In July 1984, the court signed an order which amended the decree largely, although by no means entirely, in accordance with the plaintiffs' proposal.

### D. *Rule 59(e) Motion*

The Secretary then moved for a rehearing pursuant to Rule 59(e) on the grounds that (1) the court lacked jurisdiction to enforce the decree because the action was moot as to Berger and because the court could not grant relief to nonparties, and (2) the court lacked the power to order the Secretary to promulgate regulations and internal operating instructions. The court rejected both of these contentions.

The Secretary then took this appeal from the district court's four orders, challenging the substance of the Amendment and its jurisdictional underpinnings. We granted a stay of the district court's orders pending the outcome of the appeal.

as required by the same opinion, in combina‐tion with the provisions of 20 C.F.R. § 416.‐1600(c) and § 416.1618(b). *See infra* note 17.

DISCUSSION

### I. *The Court's Jurisdiction to Enforce the Decree*

The Secretary's jurisdictional contentions are without merit. First, she objects that the decree cannot be enforced because the action itself is moot; second, she objects that the court's Amendment requires enforcement of the decree with respect to persons who are not parties to the action.

### A. *Mootness*

The Secretary's first contention is that the action must be dismissed for mootness. She argues that the action is moot because Berger—the only named beneficiary still alive[6]—is receiving the SSI benefits he sought in bringing the action. She further argues that no one else is entitled to enforce the decree. In the latter connection, she asserts that persons cannot intervene under Rule 71 to enforce the decree.

Under the Secretary's approach, the heart of the decree—¶ 3—would have been unenforceable at the moment it came into existence. In other words, the Secretary would like to have it both ways: she wants the litigation against her to be concluded based on her agreement—sanctioned by the court—to adopt a given interpretation of a statutory provision and yet, by providing those specifically *named* in the decree with benefits, she also wants to prevent the court from requiring her to implement this interpretation.

For several reasons, we reject the Secretary's approach. We find that the action was not moot as to Berger, and that the persons participating in the enforcement action were entitled to do so under Rule 71.

■ 1. The Secretary argues that since Berger is being provided SSI benefits under the decree, he is already receiving all the relief he sought in his action, and that the case is therefore moot as to him. The Secretary, however, misstates the issue. The consent decree entered in this action stipulated that Berger was eligible for SSI benefits, and that he would continue to receive benefits as long as his alienage status continued to make him eligible. Berger asserted that the Secretary was not complying with the decree, and instituted contempt proceedings to enforce the decree. The real question, therefore, is whether, in the face of the Secretary's alleged non-compliance, Berger was entitled to ensure, by means of proceedings to enforce the decree, that he continued to receive benefits, or whether he was precluded from so doing because he had not yet lost those benefits.[7] Thus, the issue is not—as the Secretary contends—whether the action is *moot* because Berger is currently receiving benefits. Rather, the issue is the *ripeness* of his claim of noncompliance, i.e., whether the challenged conduct was sufficiently threatening to Berger to justify his invocation of the court's jurisdiction.[8] This question must be answered in the affirmative.

---

**6.** As previously noted, Mena, the other named beneficiary, is deceased.

**7.** This case is therefore to be distinguished from cases like *Boyd v. Justices of Special Term,* 546 F.2d 526 (2d Cir.1976) (per curiam), where there was no prior decree in effect and no alleged noncompliance. In that case, plaintiffs had brought suit "to vindicate [their] claimed constitutional right to the assignment of counsel in their state divorce proceedings." *Id.* at 527. The action was dismissed as moot after the named plaintiffs had actually obtained appointed counsel for the purposes of those proceedings and could therefore be said to have received all the relief they sought in their federal action.

**8.** "Ripeness and mootness easily could be seen as the time dimensions of standing." 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531.12, at 50. Standing asks whether an alleged injury is adequate to justify judicial consideration. Ripeness and mootness both assume "that an asserted injury would be adequate; ripeness then asks whether an injury that has not yet happened is sufficiently likely to happen," *id.*, and mootness asks "whether the occasion for judicial intervention persists." *Warth v. Seldin,* 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 2205 n. 10, 45 L.Ed.2d 343 (1975). Thus, in this case, where a threatened injury is at issue, the proper line of inquiry pertains to ripeness: "whether the harm asserted has matured sufficiently to warrant judicial intervention." *Id.* at 499 n. 10, 95 S.Ct. at 2205 n. 10.

"It is axiomatic that the judicial power conferred by Art. III may not be exercised unless the plaintiff shows 'that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.' " *Blum v. Yaretsky*, 457 U.S. 991, 999, 102 S.Ct. 2777, 2783, 73 L.Ed.2d 534 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)). The *Yaretsky* Court, however, emphasized that "[o]f course, '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief.' *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 [43 S.Ct. 658, 663, 67 L.Ed. 1117] (1923), quoted in *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 [99 S.Ct. 2301, 2308, 60 L.Ed.2d 895] (1979). '[T]he question becomes whether any perceived threat to respondents is sufficiently real and immediate to show an existing controversy....' " *Yaretsky*, 457 U.S. at 1000, 102 S.Ct. at 2784 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)).

In *Yaretsky*, petitioners, who were administrators of state agencies, asserted that the Court was without jurisdiction to hear objections by respondents, who were nursing home residents, to certain types of transfers between facilities. Petitioners argued that respondents had obtained complete relief under the consent judgment previously entered in the action, and that since the petitioners themselves had not been threatened with the type of transfer now challenged, they were without standing to object to those transfers. The Court rejected petitioners' argument. In determining that it had jurisdiction to hear respondents' claims, the Court reasoned that "the nursing homes in which respondents reside remain free to determine ... that respondents' continued stay at current levels of care is not medically necessary. The

possibility that they will do so is not 'imaginary or speculative.' " *Id.* (quoting *Younger v. Harris*, 401 U.S. 37, 42, 91 S.Ct. 746, 749, 27 L.Ed.2d 669 (1971)). The Court also noted that "[i]n light of similar determinations made by the committee of physicians chosen by the facilities to make such assessments, the threat is quite realistic." *Id.* 457 U.S. at 1000–01, 102 S.Ct. at 2784.

In the case at bar, the contempt motion was based on evidence of the Secretary's repeated failure to carry out the terms of ¶ 3 of the decree. This failure posed a threat to all those SSI recipients and applicants whose eligibility depended on the "color of law" provision. A party's noncompliance with certain aspects of a decree is a powerful indication that the party may not feel bound to honor other aspects. *See Yaretsky*, 457 U.S. at 1000–01, 102 S.Ct. at 2783–84 (citing *O'Shea*, 414 U.S. at 496, 94 S.Ct. at 676 ("[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.")). In support of the motion for contempt, the court was presented with documents concerning various individuals who had been improperly denied benefits under the "color of law" provision. The fact that Berger's benefits had not been terminated is of no moment; under the circumstances, it was not necessary for Berger to wait for the axe to fall on him also before he brought suit.

The decree provides Berger with benefits only "as long as his immigration status remains that of an alien permanently residing in the United States under color of law...." Under this language, his continued receipt of benefits remains dependent upon the Secretary's interpretation of the "color of law" provision, and, specifically, on her implementation of the interpretation set forth in ¶ 3.[9] Her alleged noncompli-

9. Furthermore, looking at the case as it has developed to date, *see Blanchette v. Connecticut Gen. Ins. Corp.*, 419 U.S. 102, 140, 95 S.Ct. 335, 356, 42 L.Ed.2d 320 (1974), it appears that the Secretary's position regarding the decree is a direct threat to Berger's continued receipt of benefits. Berger did not enter this country as a

refugee and did not arrive prior to July 1948. Thus, Berger's eligibility for SSI would be in jeopardy if the court were persuaded by the Secretary's argument that SSI eligibility pursuant to the "color of law" provision is limited to refugees and persons who entered the United States prior to July 1948.

ance with ¶ 3 was therefore a significant threat to Berger's interests.[10] Thus, we agree with the district court that the Secretary's failure to properly educate agency staff regarding the eligibility standard under ¶ 3 of the decree posed a threat to Berger that was sufficiently real and immediate to amount to an existing controversy entitling him to enforce the decree.

■ 2. Furthermore, under a second line of reasoning, we believe that basic contract principles supported Berger's right to move for enforcement of the decree. The decree is a contract embodying promises made to Berger by the Secretary in exchange for the termination of his action. *See Dotson v. United States Dep't of Hous. and Urban Dev.*, 731 F.2d 313, 318 (6th Cir.1984) ("A consent decree ... is ... a contract that has been negotiated by the parties...."); *see also United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). Berger brought suit on behalf of himself and all others similarly situated. Although no class was certified, the Secretary agreed in the decree (1) to provide benefits to the named beneficiaries, and (2) to adopt and apply the interpretation of the "color of law" provision set forth in ¶ 3. The promise incorporated in ¶ 3 was made to Berger, as promisee. Berger could therefore challenge noncompliance with ¶ 3 and sue to enforce the promise it contained. Moreover, to the extent that he was suing on behalf of third parties benefited by the

The Secretary's observation—in a footnote unrelated to her mootness claim—that Berger's particular circumstances gave him "the effective equivalent of refugee status," and her representation that she does not intend to terminate Berger's benefits do not eliminate the threat posed to Berger by the Secretary's failure to comply with the decree. She has presented him with no affidavit setting forth these assurances. In any event, he would remain dependent upon her compliance for continued receipt of benefits, and she might at any time resolve that he does not meet the "color of law" standard. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 100–01, 103 S.Ct. 1660, 1664, 75 L.Ed.2d 675 (1983) (defendant's imposition of a six-month moratorium on use of chokeholds by police did not moot case challenging that practice since moratorium was not permanent).

decree, he was supported by state contract law, since in New York a promisee for the benefit of third parties may enforce the promise on behalf of the third parties. *See In re Spong*, 661 F.2d 6, 10 (2d Cir.1981); *In re O.P.M. Leasing Servs.*, 21 B.R. 993, 1005 (Bankr.S.D.N.Y.1982); *City of New York v. Smith*, 279 F.Supp. 866, 869 (S.D. N.Y.1968); *see also Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir.), *cert. denied sub nom. County of Nassau v. Owens*, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979) (considering New York law regarding third party beneficiaries in discussion of contract governed by federal law); *cf.* Rule 17(a) ("a party with whom or in whose name a contract has been made for the benefit of another ... may sue in his own name....").

Significantly, this is not a situation in which the plaintiff in an individual action has passed out of the original condition which gave him standing. *See Lasky v. Quinlan*, 558 F.2d 1133, 1136 (2d Cir.1977) (individual plaintiffs who sought to enforce compliance with a consent decree regarding jail conditions could not do so after they had been released from the jail; they no longer had an "interest in the enforcement of the decree").[11] Berger continues to have the same interest in the decree as he had when it was entered into, and the same interest in the suit as he had when it was instituted. He remains a recipient of SSI and is dependent, for the receipt of bene-

10. *Cf. Immigration and Naturalization Serv. v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 1763 n. 4, 80 L.Ed.2d 247 (1984) (Employees who had been questioned at work by agency officials had standing to bring suit challenging the questioning since "[t]hey allege[d] the existence of an ongoing policy which violated the Fourth Amendment and which [would] be applied to their workplace in the future." (citation omitted)).

11. *Cf. In re Grand Jury Proceedings*, 574 F.2d 445, 447 (8th Cir.1978) ("If the complaining party is no longer entitled to the benefit of the contempt order, the contempt proceedings should be terminated."); *Parker v. United States*, 153 F.2d 66, 71 (1st Cir.1946) (same).

fits, on his eligibility pursuant to the "color of law" provision.

Under these circumstances, even if Berger had not shown sufficient threat of injury with respect to his own receipt of benefits, he was entitled to come into court to complain of noncompliance as it affected third parties *because the Secretary's promise to benefit third parties was included in a valid contract with him.* That is to say, Berger had *already* been injured by the fact that the Secretary had failed to carry out all of the promises she made to him on behalf of third parties.

■ 3. The individuals who sought, under Rule 71 to join in Berger's contempt motion have the right to enforce the decree.[12] Rule 71 provides in pertinent part: "When an order is made in favor of a person who is not a party to the action, he may enforce obedience to the order by the same process as if he were a party...."

In the instant case, the intervenors properly sought to enforce obedience to a prior order made in their favor. The consent decree is conceded to provide benefits to non-parties. By its terms, the decree provides for a particular construction of the SSI eligibility provision, which construction benefits innumerable applicants who will be entitled to SSI pursuant to the decree. As a practical matter, of course, it would not have been possible to name these past, present and future applicants in the decree.[13]

Although there is substantial authority for the proposition that "a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to

it even though they were intended to be benefited by it," *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975) (citations omitted), we think that this authority was not intended to preclude nonparties from intervening to enforce a consent decree where otherwise authorized by the federal rules of civil procedure. *See United States v. American Cyanamid Co.,* 719 F.2d 558, 564 n. 6 (2d Cir.1983), *cert. denied sub nom. American Cyanamid Co. v. Melamine Chemicals, Inc.,* —— U.S. ——, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984) (court found that the rule against enforcement of consent decrees by third parties did not apply under the circumstances since, as an intervenor under Rule 24(b), company would be barred from relitigating issues under the doctrines of res judicata and collateral estoppel).

In *Lasky v. Quinlan, supra,* a case in which no class was certified, a contempt proceeding to enforce a consent decree providing for improvements in the county jail was instituted by the original plaintiffs who were no longer in custody in that jail. The court found the action moot as to the original plaintiffs, and rejected the contention that Rule 71 provided a basis on which the original plaintiffs could enforce the decree. The court said,

It seems clear that Rule 71 was intended to assure that process be made available to enforce court orders in favor of and against persons who are properly affected by them, even if they are not parties to the action.... While Rule 71 may support a separate action by a present

---

**12.** The three intervenor-participants in the contempt motion were seeking or had been denied benefits pursuant to Section (B)(ii). One, Alberto Cattons, now has an application pending before the Social Security Administration after remand from the district court for further consideration. Another, Alicia Velazquez, was found eligible for SSI in early 1985 by Judge Sifton; her case was also remanded to the Secretary. The third is now deceased.

In support of the contempt motion, evidence was presented to the court regarding the experience of numerous other applicants for SSI pursuant to Section (B)(ii).

**13.** There is no contention that the Rule 71 intervenors here do not have standing. *Cf. Moore v. Tangipahoa Parish School Bd.,* 625 F.2d 33, 34–35 (5th Cir.1980) (per curiam) (nonparty without standing under zone-of-interests test could not enforce decree under Rule 71); *Wirtz v. National Maritime Union of America,* 409 F.2d 1340, 1341 (2d Cir.1969) (nonparty could not enforce an order of the court under Rule 71 where his enforcement motion raised issues not addressed in the court's prior order).

inmate to enforce the order obtained by the plaintiffs, it cannot be used by a party to enforce an order in an action in which he no longer has standing to sue. 558 F.2d at 1137. *Lasky* effectively gave persons who were not original parties a green light to pursue enforcement of the consent decree at issue. *Cf. In re Spong*, 661 F.2d at 10 ("In a third party beneficiary contract, benefits flow to both the promisee and the third party, and either may sue to enforce the contract." *Id.* (citing New York cases)); *Owens v. Haas*, 601 F.2d at 1250–51.

The Secretary contends that while this language might permit a putative class member to bring a separate action, it does not permit intervention by such persons in a proceeding instituted by a named plaintiff, and thus does not support participation by the intervenors in this case. It is clear, however, that the Secretary misreads this language. Of course, where, as here, plaintiff himself is able to pursue enforcement by means of a contempt proceeding, judicial economy virtually requires that appropriate persons be permitted to intervene under Rule 71.

### B. *Benefits to Nonparties*

■ The Secretary's second contention is that the court was without jurisdiction to enter the Amendment because it confers benefits on nonparties. The Secretary points to the fact that no class was certified in this action, and argues that the power of the court does not extend to the granting of relief to any persons other than those named in the decree, since they were the only parties properly before the court. Although the Secretary concedes that the original decree provided for relief to nonparties, she nevertheless asserts that this problem has only now become clear because "the district court has ordered injunctive relief in favor of nonparties to effectuate its interpretation of the original consent judgment." The Secretary's argument must be rejected.

Plaintiff filed a class complaint. The consent decree was entered, however, prior to certification of a class, as the preamble to the decree specifically acknowledged. When the Secretary raised the absence of class certification on her Rule 59(e) motion below, the plaintiffs made a motion for class certification. The district court ruled that certification was unnecessary, and the motion, untimely.

The absence of class certification is not problematic in this case, and does not affect the enforceability of the Amendment or of the decree itself. We agree with the court below that certification of a class was not necessary here since the decree's prospective "relief will benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment." *Davis v. Smith*, 607 F.2d 535, 540 (1978), *recalled and remanded on other grounds*, 607 F.2d 540 (2d Cir.1979); *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974); *Feld v. Berger*, 424 F.Supp. 1356, 1363 (S.D.N.Y.1976); *see also Lasky v. Quinlan*, 558 F.2d at 1135; Note, *Administrative Agency Intracircuit Nonacquiescence*, 85 Colum.L.Rev. 582, 596 & n. 96 (1985).

In *Feld v. Berger*, the court found that class certification would be "superfluous" where four plaintiffs, residents of nursing homes, sought injunctive and declaratory relief against certain practices and regulations of defendant administrators on the ground that they violated due process principles and applicable federal regulations. The court reasoned,

> The defendants are public officials charged with compliance with and enforcement of federal as well as state laws. The Court assumes these public officials, mindful of their responsibilities, will apply the determination here made equally to all persons similarly situated. "[I]t would be unthinkable that the ... defendants would insist on other actions being brought" to vindicate the same rights at issue here.

424 F.Supp. at 1363 (footnote omitted) (quoting *Vulcan Soc'y v. Civil Serv.*

*Comm'n,* 490 F.2d 387, 399 (2d Cir.1973)). Similarly, in *Galvan v. Levine,* a district court's refusal to certify a class was upheld where the defendant had "made clear that it underst[ood] the judgment to bind it with respect to all claimants." 490 F.2d at 1261.

In this case, it is undisputed that the Secretary agreed, in signing the decree, to confer certain benefits on nonparties. It is clear to this court that, in so doing, she also agreed to the *enforcement* of the decree in favor of nonparties. Therefore, as in the above-cited cases, certification of a class was unnecessary.[14]

If the Secretary had objections to the interpretation as set forth in the consent decree, she could have refused to sign the decree in 1978, or challenged the decree on direct appeal. The judgment contained a stipulated interpretation of a statutory provision. It is simply untenable for her to contend at this juncture that because she disagrees with the interpretation in the decree she will not be bound by it except as it affects persons within the Eastern District of New York.[15]

The Secretary cites cases to the effect that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs. *See Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979). Such cases are not, however, governing where, as here, the defendant consented to the relief provided. Furthermore, the Secretary's position is in direct conflict with her own regulations which provide for nationwide uniformity in eligi-

bility standards for the SSI program. 20 C.F.R. § 416.110(d) (1984).[16]

In support of her argument on this issue, the Secretary also cites cases pertaining to preliminary injunctive relief; they, too, are inapposite here. They stand for the proposition that because the preliminary injunction is designed "to preserve the status quo during litigation to determine the merits of the case," *Hollon v. Mathis Indep. School Dist.,* 491 F.2d 92, 93 (5th Cir.1974) (per curiam), preliminary injunctive relief granted in the absence of class certification "may properly cover only the named plaintiffs." *National Center for Immigrants Rights v. Immigration and Naturalization Serv.,* 743 F.2d 1365, 1371 (9th Cir. 1984); *Hollon,* 491 F.2d at 93. Since there has been a final judgment disposing of this action on the consent of the parties, the constraints applicable upon the granting of preliminary extraordinary relief have no relevance here.

## II. *The Consent Decree*

As previously discussed, the consent decree was amended by the district court after it had ruled, on a contempt motion, that the Secretary had failed to comply with certain of its central terms. The procedural and substantive history of this case is a complex illustration of the dynamic interaction between the courts and litigants pursuant to the entry of a consent decree.

Consent decrees are a hybrid in the sense that they are at once both contracts and orders, *see United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236 n. 10, 95

---

**14.** The Secretary distinguishes between the instant case and the cases she cites in which benefits "automatically inure" to nonparties. *See, e.g., United Farmworkers of Fla. Hous. Project, Inc. v. City of Delray Beach,* 493 F.2d 799, 812 (5th Cir.1974) (suit challenged city's refusal to allow proposed housing project to tie into existing water and sewer pipes on the ground that refusal was racially discriminatory). We do not see the distinction.

**15.** Further, we reject the Secretary's argument that in the absence of a class a consent decree requiring application of the "color of law" provision "in a particular way to one alien does not as a practical matter require that it be applied in

the same way to all aliens." This argument flies in the face of logic and administrative integrity. Indeed, it amounts to another "case of the great United States going back on its word...." *Geisser v. United States,* 513 F.2d 862, 863 (1975), *modified in* 627 F.2d 745 (5th Cir.1980), *cert. denied sub nom. Bauer v. United States,* 450 U.S. 1031, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981) (quoted in *United States v. 119.67 Acres of Land,* 663 F.2d 1328, 1330 (5th Cir.1981)).

**16.** Section 4116.110(d) provides that "[t]he eligibility requirements and the Federal minimum income level are identical throughout the 50 States and the District of Columbia."

S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975); they are construed largely as contracts, but are enforced as orders. *See Schurr v. Austin Galleries,* 719 F.2d 571, 574 (2d Cir.1983); *American Cyanamid Co.,* 719 F.2d at 563–64. It is recognized that a consent decree represents a compromise between parties who have waived their right to litigation and, in the interest of avoiding the risk and expense of suit, have "give[n] up something they might have won had they proceeded with the litigation.... For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.,* 402 U.S. at 681–82, 91 S.Ct. at 1757; *see also Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, 104 S.Ct. 2576, 2586, 81 L.Ed.2d 483 (1984).

■ The court is not entitled to expand or contract the agreement of the parties as set forth in the consent decree, *see Artvale, Inc. v. Rugby Fabrics Corp.,* 303 F.2d 283, 284 (2d Cir.1962) (per curiam), and the explicit language of the decree is given great weight. *See Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.,* 689 F.2d 885, 892–93 (9th Cir.1982). By the same token, deference is to be paid to the plain meaning of the language of a decree and the normal usage of the terms selected. *See United States v. Atlantic Refining Co.,* 360 U.S. 19, 22–23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959). Nevertheless,

Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such

reliance does not in any way depart from the "four corners" rule of *Armour.* *ITT Continental Baking Co.,* 420 U.S. at 238, 95 S.Ct. at 935 (footnote omitted); *see American Cyanamid Co.,* 719 F.2d at 563. The construction of a consent decree is an issue of law freely reviewable by this court. *United States v. Board of Educ.,* 717 F.2d 378, 382 (7th Cir.1983).

■ Consent decrees are subject to continuing supervision and enforcement by the court. "[A] court has an affirmative duty to protect the integrity of its decree. This duty arises where the performance of one party threatens to frustrate the purpose of the decree." *Stotts v. Memphis Fire Dep't,* 679 F.2d 541, 557 (6th Cir.1982), *rev'd on other grounds sub nom. Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (footnote omitted) (discussing cases).[17] A defendant who has obtained the benefits of a consent decree—not the least of which is the termination of the litigation—cannot then be permitted to ignore such affirmative obligations as were imposed by the decree.

As a general matter, a " 'federal court's interest in orderly, expeditious proceedings,' *Hutto v. Finney,* 437 U.S. [678, 696, 98 S.Ct. 2565, 2576, 57 L.Ed.2d 522 (1978)], justifies any reasonable action taken by the court to secure compliance with its orders." *Gates v. Collier,* 616 F.2d 1268, 1271 (5th Cir.1980). Where "a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

■ Thus, "[t]he measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." *McComb v. Jacksonville Pa-*

17. *See also Stotts,* 104 S.Ct. at 2586 (The Court, implicitly accepting the appellate court's analysis of the court's duty to protect its decrees, ruled that the district court's action in that case had not been an exercise of that duty; "We therefore conclude that the [district court's order] does not merely enforce the agreement of the parties as reflected in the consent decree. If the [order] is to stand, it must be justified on some other basis.").

*per Co.,* 336 U.S. 187, 193, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949); *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 673 F.2d 53, 56–57 (2d Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982) (a court has broad discretion in the context of contempt to fashion an order to coerce compliance with a prior judgment); *see also Fortin v. Comm'r of the Mass. Dep't of Public Welfare,* 692 F.2d 790, 797–98 (1st Cir.1982). In enforcing its orders, a district court may take such steps as are appropriate given the resistance of the non-compliant party. *See Madden v. Grain Elevator, Flour and Feed Mill Workers, Local 418,* 334 F.2d 1014, 1020 (7th Cir. 1964), *cert. denied,* 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560 (1965).[18]

■ Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt. *Alexander v. Hill,* 707 F.2d 780, 783 (4th Cir.1983), *cert. denied sub nom. Syria v. Alexander,* — U.S. —, 104 S.Ct. 206, 78 L.Ed.2d 183 (1983). Thus, in *Class v. Norton,* 376 F.Supp. 496 (D.Conn.), *aff'd in part and rev'd in part on other grounds,* 505 F.2d 123 (2d Cir. 1974), the district court declined to find the defendant in contempt, but stated, "[C]on-

tinued non-compliance cannot and will not be tolerated, and I find it necessary to draw on the 'broad discretionary power' of the trial court to fashion equitable remedies which are 'a special blend of what is necessary, what is fair, and what is workable.'" 376 F.Supp. at 501 (quoting *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) (footnote omitted)).[19]

■ In the instant case, the district court's Amendment to the decree was appropriate in light of its duty to protect the integrity of its judgments. The district court found, pursuant to proceedings on plaintiffs' motion for contempt, that the Secretary was not in compliance with the consent decree. Specifically, the court made the determination—here unchallenged—that the Secretary had not properly publicized the interpretation of the "color of law" language contained in ¶ 3 of the decree.

In evaluating the Secretary's argument that the existing agency regulations fully effectuated the terms of the decree, the court examined both the pertinent regulations—20 C.F.R. §§ 416.1600(c), 416.1618 [20] —and the agency's internal operating instructions. The court found that

---

**18.** In acting to bring a noncompliant party into compliance with a prior order, the district courts have adopted a variety of approaches. *See, e.g., Spain v. Mountanos,* 690 F.2d 742, 746 (9th Cir.1982) (Rule 70 used to compel compliance with money judgment); *Gary W. v. Louisiana,* 622 F.2d 804, 806–807 (5th Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 193 (1981) (same); *Rodriguez v. Swank,* 496 F.2d 1110, 1111–12 (7th Cir.), *cert. denied,* 419 U.S. 885, 95 S.Ct. 151, 42 L.Ed.2d 125 (1974) (order issued setting out liability in damages to be incurred for noncompliance with prior injunction); *Cole v. Hills,* 396 F.Supp. 1235, 1238–39 (D.D.C.1975) (order issued requiring submission of plan for compliance with prior injunction); *Mims v. Duval County School Bd.,* 350 F.Supp. 553, 554 (M.D.Fla.1972) (injunction entered to enforce prior judgment).

**19.** There is authority for the proposition that where a district court has provided a supplementary remedy to compel compliance without making a finding of contempt, a reviewing court may treat the remedy as if it were a sanction imposed on an order of contempt. *See*

*Rodriguez v. Swank,* 496 F.2d at 1111–13. Although we might, under that approach, treat the district court's Amendment in this case as an exercise of the court's power to hold a party in contempt, we rest our analysis instead on the district court's even more basic authority to compel compliance with its orders.

**20.** Section 416.1600 reads in pertinent part:
In this subpart, we tell you what kinds of evidence show that you are a resident of the United States (see § 416.1603) and—
(a) A citizen or a national of the United States (see § 416.1610);
(b) An alien lawfully admitted for permanent residence in the United States (see § 416.-1615); or
(c) An alien permanently residing in the United States under color of law (see § 416.1618).
Section 416.1618, to which the reader is referred by section 416.1600(c), is entitled "How to prove you are permanently residing in the United States under color of law." It lists certain forms and documents that will be accepted as proof that the alien satisfies section 416.-1600(c).

Neither of [the C.F.R.] provisions reflect ... the position of the Secretary as stated in [¶] 3 of the final judgment ... that aliens residing in the United States with the knowledge and permission of the INS and whose departure from the United States the INS does not contemplate enforcing are permanently residing in the United States and may be eligible for SSI benefits.

With regard to the agency's internal operating instructions, the court concluded,

Nor are there any provisions in the [operations] manual broadly stating the Secretary's position. Those provisions to which plaintiffs have referred ... limit the categories of aliens who may be eligible for SSI benefits as permanently residing in the United States under color of law to aliens admitted as refugees, aliens paroled indefinitely, aliens granted indefinite stays of deportation or voluntary departure for an indefinite period by the INS or the courts, and aliens granted asylum by the Attorney General.

Accordingly, the court directed the Secretary to take steps to effectuate the terms of the final judgment by promulgating amendments to the agency's regulations, operations manuals and guidelines to reflect the Secretary's position as stated in ¶ 3 of the decree.[21] In addition, the court ordered the parties to settle an amended final judgment clarifying ¶ 3 of the original decree by setting forth some of the categories of aliens which were within the ambit of the standard set forth therein.

The Amendment ultimately entered by the court did not meet with the approval of the Secretary. She now challenges the Amendment principally on the ground that it is *ultra vires* because it conflicts with Section (B)(ii). She also argues that the Amendment is *ultra vires* because it goes beyond the scope of the original decree.

Finally, she argues that if the district court's broad reading of the original decree is proper, then the original decree is *ultra vires* because it conflicts with the underlying statute, and is therefore unenforceable as written.

A. *The Underlying Statute: Section (B)(ii)*

The Secretary contends that the Amendment is in conflict with the SSI statute because it confers eligibility on certain aliens who are not accorded eligibility by Section (B)(ii), if that provision is interpreted in light of its legislative history. She argues that the because of this conflict between the Amendment and the statute, the Amendment cannot stand under the Supreme Court's opinions in *System Fed'n No. 91 v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), and *Firefighters Union No. 1784 v. Scotts, supra.*[22]

To support her contention that the Amendment is precluded by the statute, she points to two elements of the legislative history of Section (B)(ii): a Senate Finance Committee Report, and a floor amendment to the SSI bill in conjunction with accompanying remarks. We find her citations to the legislative history unconvincing in their own right and in the face of the language of the statutory provision.

■■■■ Our starting place in determining the intended meaning of a statutory provision is, of course, the language of the statute. *See Belland v. Pension Benefit Guar. Corp.,* 726 F.2d 839 (D.C.Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984). However, the fact that the statutory language—and its plain meaning—are the starting place for construing a statute "does not 'preclude consideration of persuasive evidence [of differing legislative intent] if it exists.' " *March*

---

**21.** The Secretary was also directed to comply with that portion of the consent decree which required her to provide notification regarding the ¶ 3 standard to persons who had been denied benefits on the basis of their alienage status, and to inform them of their right to contest their denial of benefits.

**22.** We do not reach this issue here since we find, upon examination of the statute in question and the arguments put forward, that the Amendment is in no way inconsistent with the underlying statutory provision.

*v. United States,* 506 F.2d 1306, 1313 (D.C. Cir.1974) (footnote omitted) (quoting *Boston Sand and Gravel Co. v. United States,* 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928)). Indeed, where the scope of a statutory provision is not made crystal clear by the language of the provision, it is appropriate to turn to the legislative history of the statute. *See Allen v. State Bd. of Elections,* 393 U.S. 544, 570, 89 S.Ct. 817, 834, 22 L.Ed.2d 1 (1969); *Schwartz v. Romnes,* 495 F.2d 844, 849 (2d Cir.1974). Further, legislative history may be consulted in order to ascertain "whether literal application of the statute would 'pervert its manifest purpose.'" *See United States v. Perdue Farms, Inc.,* 680 F.2d 277, 280 (2d Cir.1982) (quoting *In re Adamo,* 619 F.2d 216, 222 (2d Cir.), *cert. denied sub nom. Williams v. New York State Higher Educ. Servs. Corp.,* 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980)); *see also Litchfield Sec. Corp. v. United States,* 325 F.2d 667, 673 (2d Cir.1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1333, 12 L.Ed.2d 295 (1964).

With these principles in mind, we will first examine the language of Section (B)(ii), and then consider the Secretary's contentions with respect to its legislative history.

### 1. *Statutory Language*

█ The scope of the phrase in question —"or otherwise permanently residing in the United States under color of law"—is not clear from the language employed. Instead, the phrase is designed to be adaptable and to be interpreted over time in accordance with experience, developments in the law, and the like. In this sense the phrase is organic and fluid, rather than prescriptive or formulaic.

We agree wholeheartedly with the district court's characterization of the phrase as "both expansive and elastic." As Judge Sifton observed, "On its face, by its reference to 'under color of law,' the language [of Section (B)(ii)] invites dynamic interpretation by both courts and the administrative agency charged with the statute's enforcement to determine the statute's application in particular cases in the light of developments in the country's immigration policy."

In *Holley v. Lavine,* 553 F.2d 845 (2d Cir.1977), *cert. denied sub nom. Shang v. Holley,* 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978), the court construed the phrase "under color of law" in a virtually identical regulatory provision regarding the Aid to Families with Dependant Children ("AFDC") program.[23] The court said,

The phrase ["under color of law"] obviously includes actions not covered by specific authorizations of law. It embraces not only situations within the body of the law, but also others enfolded by a colorable imitation. "Under color of law" means that which an official does by virtue of power, as well as what he does by virtue of right. The phrase encircles the law, its shadows, and its penumbra. When an administrative agency or a legislative body uses the phrase "under color of law" it deliberately sanctions the inclusion of cases that are, in strict terms, outside the law but are near the border.

553 F.2d at 849–50. The Secretary's narrow interpretation of this language is thus clearly inconsistent with the expansive approach previously taken in this circuit—an approach we consider well-taken.

The phrase "permanently residing," which appears in Section (B)(ii), should also be read in accordance with our reasoning in *Holley* regarding that phrase. There, the court stated that these words should be read in light of the INAct, which provides: "The term 'permanent' means a relationship of continuing or lasting nature, as

---

**23.** The AFDC regulations in issue, then contained at 45 C.F.R. § 233.50, provided in relevant part that the "[s]tate plan ... shall include an otherwise eligible individual who is a resident of the United States but only if he is either (a) a citizen or (b) an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law (including any alien who is lawfully present in the United States as a result of ... section [1153(a)(7)] or section [1182(d)(5)] of the [INAct])."

distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law." 8 U.S.C. § 1101(a)(31) (1982); *see Holley*, 553 F.2d at 850–51.

Like the "color of law" language in the AFDC regulations discussed in *Holley*, the "color of law" language in Section (B)(ii) is modified by a parenthetical, and the effect of the parenthetical on the meaning of the phrase as a whole must be considered. The phrase in the SSI statute reads as follows: "or otherwise permanently residing in the United States under color of law (including any alien who is lawfully present in the United States as a result of the application of the provisions of section 1153(a)(7) or section 1182(d)(5) of Title 8)." As will be discussed below, section 1153(a)(7) provides for the conditional entry of certain aliens, and section 1182(d)(5) provides that the Attorney General may temporarily parole aliens into the United States.

Under a common sense interpretation, the categories of aliens listed in the parenthetical are illustrative rather than definitive. Although the parenthetical specifies two statutory provisions which entitle an alien to classification as a permanent resident under color of law, it does not thereby limit such classification to those who fall under those two provisions.

This common sense interpretation has been codified. Congress specifically provided, in the definitions applicable to the SSI statute, that the term " 'including' when used in a definition ... shall not be deemed to exclude other things otherwise within the meaning of the term defined." 42 U.S.C. § 1301(b) (1982); *see Holley*, 533

F.2d at 851 (Section 1301(b) "is a legislative caution to lean more on the 'ejusdem generis' than on the 'inclusio unius, exclusio alterius' cannon of construction."). Certainly, in light of this codification, the statutory provisions listed should be viewed as examples—members of a series whose scope is not delineated.

We cannot find any support in the language of Section (B)(ii) for the Secretary's limited interpretation of that provision. She argues that Congress intended the "color of law" provision to confer eligibility on only two groups of aliens: those who entered the country as refugees, and those who entered the country prior to June 30, 1948. The language does not, however, *say* what the Secretary argues it *means*. The language does not indicate that eligibility is limited to the two categories urged by the Secretary; indeed, neither of these categories is referred to explicitly.

Further, the parenthetical appears on its face to undermine the Secretary's position. The parenthetical lists two provisions, section 1153(a)(7) and section 1182(d)(5). The first, section 1153(a)(7), provides for conditional entry, and addresses the entry of refugees in particular.[24] The second, section 1182(d)(5), is more general; it permits the Attorney General to temporarily parole, for emergent reasons or for reasons deemed strictly in the public interest, any alien applying for admission to the United States.[25] Indeed, the Secretary, while explaining that the provision is *used* to allow entry to refugees, does not dispute that the provision is not limited to this purpose. Nor does she contend that it is used solely for this purpose. Thus, we find that the parenthetical weighs heavily against the Secretary's interpretation of Section (B)(ii).

---

**24.** When Section (B)(ii) was enacted in 1972, section 1153(a)(7) provided in pertinent part: "Conditional entries shall ... be made available by the Attorney General ... to aliens who ... because of persecution or fear of persecution on account of race, religion, or political opinion ... have fled [certain designated areas] ...; or ... are persons uprooted by catastrophic natural calamity...." 8 U.S.C. § 1153(a)(7) (1970).

**25.** When Section (B)(ii) was enacted, section 1182(d)(5) provided in pertinent part: "The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States...." 8 U.S.C. § 1182(d)(5) (1970).

## 2. Legislative History

Although we find that the restrictive interpretation urged by the Secretary does not comport with the provision on its face, we are not adverse to examining the extrinsic materials presented by the Secretary in support of her position. The intended scope of a statutory provision may be clarified by pertinent legislative history and administrative practice. "[W]here a word or phrase is reasonably capable of more than one meaning, we have repeatedly affirmed the wisdom of looking to the entire text of the statute and to its legislative history in order to ascertain, if possible, the intent of the drafters and true scope and meaning of the term." *Schwartz v. Romnes*, 495 F.2d at 849 (citation omitted).

### a. Finance Report

The Secretary first argues that the language in a Senate Finance Committee report shows that the language "permanent resident under color of law" was "clearly intended to apply only to aliens who entered the United States before July, 1948." She points to a discussion of a proposed change in the AFDC eligibility provisions. The proposal was contained in H.R. 1, which also contained the SSI provisions, and evidently would have added the phrase "or otherwise permanently residing in the United States under color of law" to the AFDC statute. She cites the following language from the report:

> Under the committee bill ..., States would be mandated in Federal law to require as a condition of eligibility for the AFDC welfare program ... that an individual be a resident of the United States and either a citizen or alien lawfully admitted for permanent residence or a person who is a permanent resident under color of law (that is, a person who entered the United States before July 1948 and who may be eligible for admission for permanent residence at the discretion of the Attorney General under section 1259 of title 8 of the United States Code).

S.Rep. No. 1230, 92nd Congress, 2nd Sess. 466 (1972).

Were the language discussed in this excerpt incorporated in the SSI statute without modification, the Secretary's argument might carry some weight in our analysis. However, since this language was not enacted in the form discussed in the report, we are left entirely unpersuaded. As previously indicated, the "permanently residing in the United States under color of law" language of Section (B)(ii) is modified by a parenthetical—"(including any alien who is lawfully present in the United States as a result of the application of the provisions of section 1153(a)(7) or section 1182(d)(5) of Title 8)". This parenthetical not only patently broadens the meaning of the phrase beyond the interpretation contained in the Senate report, but also effectively contradicts the particular limitation the report advances.

### b. Floor Amendment & Sponsors' Remarks

The parenthetical grew out of two Senate floor amendments sponsored by Senators Chiles and Gurney of Florida.[26] The Secretary argues that the Chiles-Gurney amendments, which included "color of law" language, were "intended simply to insure that Cuban refugees would be entitled to SSI," and that the "color of law" provision should be given an accordingly limited interpretation.

One of the amendments added the language "or otherwise permanently residing in the United States under color of law" to the SSI eligibility provisions. The other added a general definition of that language which was made expressly applicable throughout the various provisions of the Act amended by the bill. This definition provided that "the term 'alien permanently residing in the United States under color of law' shall include an alien refugee who is lawfully present in the United States as a result of the application of the provisions of section [1153(a)(7)] or section

---

**26.** This parenthetical itself is not discussed in any legislative history presented to this court.

[1182(d)(5) ] of [Title 8]." The Senate approved the amendments by voice vote. When H.R. 1 was reported out of the House Conference Committee, however, it contained the language of the parenthetical as ultimately enacted, rather than the Chiles-Gurney language.

The Secretary cites the following remarks of Senator Chiles:

[The amendments] simply make clear in the bill that it would not detract from the rights to benefits of Cuban refugees, of which 12,000 reside in Florida. They are receiving benefits presently under the existing system [of state-administered federal categorical grants], but there has been some question as to whether, under this bill, they would be eligible. These amendments would make it clear that they are eligible.

118 Cong.Rec. 33959 (1972). She also cites the following remarks of Senator Gurney:

[T]hese amendments which we are introducing at this time are designed to prevent a great and unintended economic hardship being placed upon the people of Dade County, Fla.

I know that the Finance Committee and its distinguished chairman did not intend this result, however, the effect of the limiting language concerning aliens which appears ... on page 466 of the [Senate Finance C]ommittee report does just that.

*Id.* It is the Secretary's argument that these remarks indicate that the amendments as proposed and the language as enacted were intended to restrict the meaning of the "color of law" language to cover only refugees.

This is—at most—a very slender reed on which to hang the Secretary's request that we find the Amendment at issue in conflict with the underlying statute. Contemporaneous remarks of a sponsor of legislation

are by no means controlling in the analysis of legislative history. *Weinberger v. Rossi,* 456 U.S. 25, 35 n. 15, 102 S.Ct. 1510, 1517 n. 15, 71 L.Ed.2d 715 (1982). More to the point, such remarks are of little or no import where, as here, the legislature has subsequently included other language—albeit similar—in the law as enacted. To permit clear statutory language to be materially altered by the remarks of the Senate sponsors before the bill achieved final form "would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President." *Regan v. Wald,* —— U.S. ——, 104 S.Ct. 3026, 3036, 82 L.Ed.2d 171 (1984).

Furthermore, even assuming that the two Senators from Florida *intended* the "color of law" definition to limit the eligible aliens to refugees, the language of their *own* amendments stated otherwise. Their language provided that the phrase should be interpreted to "*include* an alien refugee [who is here pursuant to section 1153(a)(7) or section 1182(d)(5) of Title 8]." (Emphasis added). As discussed *supra,* the word "include" is not restrictive; it precedes an example of the members of a group. The fact that the language of the amendment identified refugees as members of the group of aliens permanently residing in the United States "under color of law" does not indicate that aliens who are not refugees are necessarily excluded from that group.

We therefore find that the Secretary's arguments regarding the legislative history of Section (B)(ii) are without merit.[27] Based on our examination of the language of the provision and our review of its legislative history, we find that the phrase, "under color of law," is designed to be an open vessel—to be given substance by experience.[28] We agree with the district court's

---

**27.** Since we have, on considering the direct appeal from the Amendment, resolved the substantive issues raised by the Secretary on her Rule 60(b) motion, we do not reach the question raised by plaintiffs regarding the district court's

jurisdiction to consider the Secretary's arguments on that motion.

**28.** Although we rest our rejection of the Secretary's position on this conclusion, we note that the appellees argue quite persuasively that the Secretary's practices—in applying "color of law"

conclusion that the "color of law" provision is inherently elastic, and we reject the Secretary's restrictive interpretation.[29]

### B. *Paragraph 3 of the Consent Decree*

■ The Secretary also argues that the Amendment goes beyond the scope of the original decree by conferring SSI eligibility on aliens who were not eligible under the original ¶ 3 as correctly construed. She contends that terms agreed to in the original decree do not support the extension of benefits to the class covered by the Amendment. As discussed below, we find that this argument is based on an incorrectly narrow interpretation of the decree which must be rejected. The Secretary also argues that if the consent decree is not accorded the narrow interpretation she urges, then the decree itself is *ultra vires* because it exceeds the scope of the statute. We reject this argument as well.

Paragraph 3 of the original decree lists several categories of aliens who will be considered to be permanently residing in the United States under color of law, and provides that any other alien residing in the United States "with the knowledge and permission" of the INS, whose departure the INS "does not contemplate enforcing," is also permanently residing in the United States under color of law.

The Secretary maintains that this language is properly interpreted to cover only those aliens as to whom there has been an official determination or authorization, embodied in a letter, that the alien is legitimately present in the country for an indefinite period of time. Although she concedes that the "knowledge and permission" language of the paragraph "permit[s] a much broader reading," she argues that

"the government never contemplated such a . . . reading."

The Secretary bases her argument in part on the well-established principle that a consent decree may be interpreted in light of "the circumstances surrounding the . . . order." *United States v. ITT Continental Baking Co.,* 420 U.S. at 238, 95 S.Ct. at 935. She asserts that in this instance the decree originated out of, and should therefore be limited to, the facts presented by Berger and Mena, the two beneficiaries named in the decree. This argument has no merit whatsoever. Paragraph 3 is so written as to make untenable any limitation of its scope to the particular facts presented by the parties named in the decree.

The Secretary also relies on the maxim that a decree must be interpreted in light of the "technical meaning words used may have had to the parties." *Id.* She contends that "[t]he limited holding of *Holley* . . . is obviously the 'technical meaning'" of the words used in the consent decree here, and that under *Holley* the broad language of ¶ 3 should be given the limitation she proposes, that is, that an official letter be a prerequisite to SSI eligibility under the decree.

In *Holley,* decided during the year before the consent decree was entered, the court determined that where an applicant for AFDC benefits is an alien parent who has official assurance that she will not be deported at least until her children are no longer dependent upon her, the parent is "permanently residing in the United States under color of law" and is thus eligible for AFDC under the governing regulations.[30] The court indicated that it considered plaintiff to be a member of a "minuscule subclass of aliens who, although unlawfully residing in the United States, are each indi-

---

language to various programs within her jurisdiction—also lend support to a broad interpretation of the provision, rather than the narrow interpretation urged by the Secretary. *See Power Reactor Dev. Co. v. International Union of Electrical, Radio and Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961) (contemporaneous construction by agency entitled to weight).

**29.** We also reject the Secretary's suggestion that the holding in *Holley v. Lavine, supra,* supports her interpretation of Section (B)(ii). *See* discussion *infra.*

**30.** *See supra* note 23.

vidually covered by a letter ... stating that the [INS] 'does not contemplate enforcing ... [the alien's] departure from the United States at this time.'" *Holley*, 553 F.2d at 849. Far more significant for the purposes of our analysis here, however, is the fact that the court found it appropriate to give an expansive interpretation to the phrase "under color of law," and to adopt an interpretation of the phrase "permanently residing" in which the conception of "permanent" more closely resembled "lasting" or "enduring," than "forever." We therefore find that, on balance, the decision in *Holley* cuts against the Secretary's argument.

In addition, although *Holley* involved an alien who had received a letter stating that no action to deport her was contemplated, we find no indication in the language of the decree before us that the receipt of such a letter is a prerequisite to "color of law" status. While ¶ 3 echoes the language of the letter in *Holley*—that is, the phrase, "does not contemplate enforcing, etc."— the glaring absence of any mention in the decree that a letter to this effect would be required is fatal to the Secretary's position.

Finally, the government's contemporaneous interpretation of *Holley* lends support to an expansive view of the consent decree, rather than a restrictive one. The petition for certiorari in *Holley*—which was denied just four months before the decree was filed—was opposed by the United States, as amicus on behalf of respondent Holley.[31] In its amicus brief, the government argued that the phrase "residing under color of law" includes those aliens whose residence in the United States is "continued by virtue of official permission or *acquiescence.*" (Emphasis added). The government also

observed that the INAct provisions listed in the parenthetical—8 U.S.C. §§ 1153(a)(7) and § 1182(d)(5)—were merely "illustrative examples," and further stated that they "obviously forbid any narrow reading" of the word "permanently."

Thus, viewed in the context in which it was drawn up, *see ITT Continental Baking*, 420 U.S. at 238, 95 S.Ct. at 935; *United States v. Bechtel Corp.*, 648 F.2d 660, 665 (9th Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981), the consent decree appears to have been entered into by the parties with the expectation that the language of ¶ 3 would be construed expansively, and the Secretary's argument to the contrary must be rejected. We agree with the district court that "the plain meaning of [¶] 3 ... clearly goes beyond [her] limited interpretation."[32] Furthermore, based on our analysis of the legislative history of Section (B)(ii), *supra*, we find no reason to believe that such an expansive reading of ¶ 3 brings the decree into conflict with the underlying statute. We therefore reject the Secretary's argument to that effect.

C. *Paragraph 3 under the Amendment*

 Having rejected the Secretary's arguments under the statute and the original decree, we turn briefly to the challenged Amendment to confirm that it comports with our conclusions regarding the underlying statute. We are satisfied that it does.

The Amendment provides, in pertinent part, that ¶ 3 of the consent judgment filed on June 13, 1978, is modified to include the language set out in the margin ("amended ¶ 3").[33] Amended ¶ 3 essentially reiterates

---

31. The government's amicus brief stated that the views expressed therein were formulated after consultation with, *inter alia,* the Department of Health, Education and Welfare—now, HHS.

32. Although we have plenary review of the question, we note that "[f]ew persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it." *Brown v. Neeb,* 644 F.2d 551, 558 n. 12 (6th Cir.1981); *see United States v. Board of Educ.,* 717 F.2d at 382.

33. Aliens who are permanently residing in the United States under color of law and who may be eligible for [SSI] benefits include, but are not limited to (1) aliens admitted to the United States pursuant to 8 U.S.C. § 1153(a)(7), (2) aliens paroled into the United States pursuant to 8 U.S.C. § 1182(d)(5), (3) aliens residing in the United States pursuant to an order of supervision, indefinite stay of deportation or indefinite voluntary departure, and (4) any other alien residing in the United States with the knowledge and permis-

the language of the original ¶ 3, and then sets out a non-exclusive list of eleven categories of aliens falling within the "color of law" provision. Finally, it states the circumstances under which an alien will be considered "as one whose departure the INS does not contemplate enforcing."

We reject the Secretary's specific challenges to the Amendment on the grounds set out in the margin,[34] and note that we find the Amendment otherwise in conformity with both the letter and the spirit of the underlying statute and the original decree. In particular, the concept of permanence incorporated in Section (B)(ii) is in no way slighted in the decree or the Amendment.[35] Rather, both the decree and the Amendment reinforce the "permanently residing" language of the statutory provision. Both are, of course, to be read in light of the

---

sion of the [INS] and whose departure from the United States the INS does not contemplate enforcing.

The foregoing categories include but are not limited to:

(a) aliens on whose behalves an immediate relative petition has been approved and their families covered by the petition, who are entitled to voluntary departure under 8 C.F.R. § 242.5(a)(2)(vi) and whose departure the INS does not contemplate enforcing;

(b) aliens who have filed applications for adjustment of status pursuant to [INAct] § 245, 8 U.S.C. § 1255, that the INS has accepted as "properly filed" within the meaning of 8 C.F.R. § 242.5(a)(2) or (b) or granted and whose departure the INS does not contemplate enforcing;

(c) aliens granted stays of deportation by court order, statute or regulation, or by individual determination of the INS pursuant to 8 U.S.C. § 1105(a) or pursuant to [INSOI] 243.3 whose departure the INS does not contemplate enforcing;

(d) aliens granted political asylum pursuant to INS § 208, 8 U.S.C. § 1158;

(e) aliens admitted as refugees pursuant to [INAct] § 207, 8 U.S.C. § 1157, or [INAct] § 203(a)(7), 8 U.S.C. § 1153(a)(7);

(f) aliens granted voluntary departure pursuant to 8 U.S.C. § 1252(b) or 8 C.F.R. § 242.5 whose departure the INS does not contemplate enforcing;

(g) aliens granted deferred action status pursuant to INSOI 103.1a(ii);

(h) aliens residing in the United States under orders of supervision pursuant to [INAct] § 242, 8 U.S.C. § 1252(d);

(i) aliens who have resided in the United States continuously since before June 30, 1948, [INAct] § 249, 8 U.S.C. 1259;

(j) aliens granted suspension of deportation pursuant to [INAct] § 244, 8 U.S.C. § 1254, whose departure the INS does not contemplate enforcing; and

(k) aliens whose deportation has been withheld pursuant to [INAct] § 243(h), 8 U.S.C. § 1253(h).

An alien in a particular category shall be considered as one whose departure the INS does not contemplate enforcing if it is the policy or practice of the INS not to enforce the departure of aliens in such category or if, on all the facts and circumstances in that particular case, it appears that the INS is otherwise permitting the alien to reside in the United States indefinitely.

**34.** Of the eleven categories listed, the Secretary objects to eight. She agrees to the following three categories: those who were admitted as refugees, those who have been residents since before July 1948, and those granted political asylum. These groups are listed as categories (e), (i) and (d) in amended ¶ 3.

Of the eight other categories listed, four appear to be challenged on the ground that they do not comport with the "permanently residing" requirement of Section (B)(ii), since they would, *inter alia,* confer SSI eligibility on mere applicants for various types of relief or review. *See* (a), (b), (c), (j). This argument is not persuasive since the categories are, in all four instances, limited to those aliens *"whose departure the INS does not contemplate enforcing."* The latter qualification satisfactorily reflects and enforces the "permanently residing" requirement of the statute. Of course, any applicants otherwise falling within the categories listed would also have to meet this qualification.

The Secretary challenges three other categories on the ground that, although they were covered by the original decree, "the legislative history of the SSI statute indicates that [some or all of the aliens in these categories] are not entitled to SSI." *See* (g), (h), (k). Since we have already rejected the Secretary's arguments based on legislative history, we need not concern ourselves further with these challenges.

The Secretary's final challenge is based on her assertion that the immigration status listed in (f) "has little if any meaning" under current usage, and that it is virtually never given for indefinite periods of time. Like the district court, we see no reason to eliminate this category based on such an analysis.

The Secretary's remaining argument, regarding the disjunctive "or" in the final paragraph, is without merit.

**35.** It should also be noted that the Secretary, in conjunction with Congress, has established a thirty-day residency requirement for SSI recipients. *See* 42 U.S.C. § 1382c(a)(1)(B) (1982); 20 C.F.R. §§ 416.1600, 416.1605 (1984).

approach to permanence taken in *Holley.* There, the court gave great weight to the INAct's definition of permanence, and observed that the INAct provisions in the parenthetical in Section (B)(ii) are "instances where the alien is permitted to stay in the United States not necessarily forever, but only so long as he is in a particular condition." 553 F.2d at 851. The provisions of the Amendment are written so that they may be executed in accordance with the same standard.

### D. *Requiring the Issuance of Regulations*

■ The Secretary also contends that the district court lacked the power to order her to promulgate regulations implementing the provisions of ¶ 3 as amended. We find that the court acted within its authority in so doing. We believe, however, that the court overstepped its authority when it required that certain language be contained in the regulations. We therefore affirm the district court's action with the proviso that the order must be modified to exclude the requirement, set out in ¶ 4, that specified language appear in the regulations issued.[36]

The Secretary asserts, citing 42 U.S.C. §§ 405(a), 1383(d)(1) (1982), that "[p]rescription of final regulations ... usurps the Secretary's statutory grant of authority to promulgate regulations," *see also* 42 U.S.C. § 1302 (1982), and that requiring their promulgation is therefore not a remedy the court has the power to provide. Plaintiffs assert that, pursuant to a finding of noncompliance by the Secretary, the court was empowered to direct her to promulgate regulations in accordance with the decree.

The question before us is whether the Secretary may continue to operate under regulations which do not comport with a judgment of the court entered upon consent of the parties. In reaching our conclusion that the district court's directive to promulgate regulations was proper under the circumstances, we are particularly persuaded by three considerations: (1) the Secretary had already promulgated regulations regarding SSI eligibility prior to the court's order; (2) the district court had found that the Secretary was not in compliance with the original decree; and (3) the Secretary had given her consent to the terms of the original decree. We address these factors below.

First, the Secretary has already chosen to promulgate regulations on the very issue of SSI eligibility which is before us. *See supra* note 20. Further, she has revised these regulations since the entry of the consent decree. Indeed, the fact that the regulations promulgated subsequent to the decree did not comport with the decree indicates that the court was, in effect, forced to order that further regulations be promulgated to ensure compliance with the terms of the decree.

Thus, the balance between the powers of the court and the powers of the executive is not at issue here. This is not an occasion in which the Secretary had chosen to refrain from taking any action. *See Heckler v. Chaney,* —— U.S. ——, 105 S.Ct. 1649, 1651–52, 84 L.Ed.2d 714 (1985) (agency refused to take certain investigatory and enforcement actions). Nor is this a situation in which the Secretary had already decided against proceeding by rulemaking, in favor of proceeding by another means. *Cf. Pressley v. Federal Communications Comm'n,* 437 F.2d 716, 721–22 (D.C.Cir. 1970) (court urged, but did not require, the agency to formulate regulations instead of proceeding solely by individual adjudication); *see generally Natural Resources*

---

**36.** Paragraph 4 of the Amendment reads, in pertinent part:

Within 90 days of the entry of this amendment to the consent judgment, the defendant Secretary shall promulgate sections of the [operations m]anual that fully implement the provisions and contain the language of amended [¶] 3 above. Within 120 days of the entry of this amendment to the consent judgment (exclusive of the minimum periods required by law for public comment and comment by the Office Management and Budget), the defendant Secretary shall promulgate final regulations that fully implement the provisions and contain the language of [¶] 3 above.

*Defense Council, Inc. v. Securities and Exchange Comm'n,* 606 F.2d 1031, 1055–56 (D.C.Cir.1979) (traditionally, agency rather than court determines whether to proceed by means of rulemaking, individual adjudication, or a combination). Nor is it a situation in which the Secretary had pursued rulemaking proceedings, but ultimately determined that a final rule should not be adopted. *WWHT, Inc. v. Federal Communications Comm'n,* 656 F.2d 807, 818–19 (D.C.Cir.1981) (agency denied a rulemaking petition after it had terminated rulemaking proceedings on the same matter without adopting a rule). Nor, finally, is it a situation in which the Secretary asserts that rulemaking proceedings on this issue would be administratively infeasible or inappropriate, or would consume an inordinate amount of time or agency resources. *Cf. Natural Resources Defense Council, Inc.,* 606 F.2d at 1045–46 (discussing various pragmatic considerations weighing against judicial review of agency's decision not to adopt regulations regarding a given activity); *see generally* Garland, *Deregulation and Judicial Review,* 98 Harv.L.Rev. 507, 562–68 (1985).

Second, the failure of the Secretary to promulgate appropriate regulations was part and parcel of a failure to effectuate the substantive terms of ¶ 3 of the decree, as well as a failure to comply with the procedural terms of ¶ 5 of the decree. Paragraph 5 of the decree is reasonably interpreted to require the promulgation of appropriate regulations. When the court found that the Secretary had failed to otherwise effectuate the eligibility standard incorporated in ¶ 3, the court was authorized to require her to issue regulations to effectuate that standard.

Under its power to take reasonable steps to enforce its orders, *see, e.g., Class v. Norton, supra,* the court was entitled to require that the Secretary promulgate regulations so as to come into compliance with the decree. Further, the plaintiffs who had bargained for the terms of the decree, and agreed to cease litigating on the basis of the decree were entitled to have the decree enforced as written.

In ordering the promulgation of regulations, the district court asked no more than that the Secretary "meet its responsibilities by adopting a fair ... rule within a reasonable period of time." *British Airways Bd. v. Port Auth.,* 564 F.2d 1002, 1013 (2d Cir.1977). "The law simply will not tolerate the denial of rights by unwarranted official inaction." *Id.* at 1010. Thus, the Secretary has merely been required to redraft her regulations to bring them into conformity with a court order to which she has consented. *Cf. Paralyzed Veterans of America v. Civil Aeronautics Bd.,* 752 F.2d 694, 726 (D.C.Cir.1985) (agency ordered to redraft regulations to bring them into conformity with statute).

Finally, the fact that the Secretary gave her consent to the original judgment is of considerable significance in evaluating her argument that the court does not have the power to require her to promulgate regulations. *Citizens for a Better Environment v. Gorsuch,* 718 F.2d 1117, 1127–28 (D.C. Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984). The judgment in this case, entered on consent, was itself an agreement by the Secretary to do certain acts. Having given her consent to terms which are understood to include the promulgation of regulations, she cannot now object to the terms as if they had been imposed upon her against her will.

In *Gorsuch,* the appellate court considered the argument that, in approving a consent decree, the district court had impermissibly limited the agency's discretion to determine the procedures and criteria it would use in preparing to promulgate regulations pursuant to the Clean Water Act. The court observed at the outset that the issue of "infringement of agency discretion [which] ... normally arises in the context of a judicial order disposing of a case on its merits ... is framed somewhat differently here because the Decree was entered *with [the agency's] consent.*" *Id.* (footnote omitted). Because the consent decree in *Gorsuch* was largely the work of the agen-

cy and the other parties to the litigation rather than the work of the district court, the appellate court concluded that "the requirements imposed by the Decree do not represent judicial intrusion into the Agency's affairs to the same extent they would if, the Decree were 'a creature of judicial cloth.' " *Id.* (quoting *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project,* 454 U.S. 139, 141, 102 S.Ct. 197, 200, 70 L.Ed.2d 298 (1981)).

Although the district court did not err in ordering the promulgation of regulations, the court's requirement that the Secretary include the language of ¶ 3 as amended in her regulations intruded unnecessarily into the administrative sphere. *See Federal Power Comm'n v. Idaho Power Co.,* 344 U.S. 17, 20, 73 S.Ct. 85, 86, 97 L.Ed. 15 (1952) (the lower court intruded on an administrative function in ordering the agency to strike an unlawful section of a license). Therefore, while we uphold the district court's requirement that the Secretary promulgate regulations which are in accordance with the decree, we find that the requirement that specified language be included in the regulations must be deleted.

CONCLUSION

The orders appealed from are affirmed, except insofar as the Amendment to the decree requires the Secretary to incorporate specified language in the regulations promulgated in accordance with that Amendment. The action is remanded so that the Amendment may be modified to exclude the latter requirement.